**CHRISTUS HEALTH GULF COAST, Christus Health Southeast Texas, Gulf Coast Division, Inc., Memorial Hermann Hospital System, and Baptist Hospitals of Southeast Texas, Appellants,**

v.

**AETNA, INC. and Aetna Health, Inc., Appellees.**

No. 14–03–01281–CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 14, 2005.

Rehearing En Banc Overruled July 21, 2005.

David E. Warden, Scott M. Clearman, Brian Dean Walsh, Houston, for appellants.

John B. Shely, Kendall Matthew Gray, Houston, for appellees.

Panel consists of Justices YATES, ANDERSON, and HUDSON.

## OPINION ON REHEARING

LESLIE BROCK YATES, Justice.

Appellants, Christus Health Gulf Coast, Christus Health Southeast Texas, Gulf Coast Division, Inc., Memorial Hermann Hospital System, and Baptist Hospitals of Southeast Texas (collectively "the Hospitals"), sued appellees, Aetna, Inc. and Aetna Health, Inc. (collectively "Aetna"), for breach of contract, quantum meruit, breach of fiduciary duty, and to collect on accounts arising from Aetna's failure to pay the Hospitals for health care services they provided to Medicare patients enrolled in an Aetna health maintenance organization ("HMO"). Aetna moved to dismiss for lack of subject matter jurisdiction, arguing that the Hospitals failed to exhaust federal administrative remedies provided under the Medicare program. The trial court agreed and dismissed for lack of jurisdiction. In three issues, the Hospitals claim the trial court erred in granting Aetna's motion to dismiss. Because we find that the Hospitals were required to first exhaust administrative remedies, we affirm.

In our opinion of December 28, 2004, we affirmed the trial court's judgment. On

January 7, 2005, the Hospitals filed a motion for rehearing. We overrule the Hospitals' motion, withdraw our previous opinion, and issue this opinion on rehearing, affirming the trial court's judgment.

## I. THE MEDICARE PROGRAM

Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395–1395ggg (2000), commonly known as the Medicare program, is administered by the Department of Health and Human Services ("HHS"). The Medicare program traditionally consisted of two parts. Part A provides insurance against the cost of institutional health services, such as hospitals and nursing homes. Part B provides, for a monthly premium, supplemental benefits for additional medical needs, such as physician services and laboratory tests. See Schweiker v. McClure, 456 U.S. 188, 189–90, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982) (describing Medicare Parts A and B).

In 1997, Congress amended the statute and added a new Part C called the Medicare + Choice or "M + C" program. Medicare Program; Medicare + Choice Program, Final Rule with Comment Period, 65 Fed.Reg. 40170, 40171 (June 29, 2000). Congress created the M + C program to "allow beneficiaries to have access to a wide array of private health plan choices" in addition to traditional Medicare and to "enable the Medicare program to utilize innovations that have helped the private market contain costs and expand health care delivery options." H.R. CONF. REP. No. 105–217, at 585 (1997), reprinted in 1997 U.S.C.C.A.N. 205–06. To accomplish these goals, the Health Care Financing Administration ("HCFA"), now called the Centers for Medicare and Medicaid Services, contracts with HMOs and other private firms to provide health care to Medicare patients who choose coverage under Part C as opposed to the traditional route of Parts A and B. Medicare + Choice Program, 65 Fed.Reg. at 40172. The entity that contracts with the HCFA is called an M + C organization. M + C organizations may then contract with providers to provide health care services to their Medicare enrollees under the terms and conditions negotiated in the contract. Such providers are contract providers. Medicare patients may also seek health care services from providers with no contractual relationship with an M + C organization. These are noncontract providers.

## II. FACTUAL BACKGROUND

NYLCare 65 is an HMO owned by Aetna, and NYLCare 65 became an M + C organization by virtue of a contract with the HCFA.[1] Aetna then contracted with North America Medical Management ("NAMM") to administer this health care program. Aetna paid NAMM a monthly capitation payment,[2] and NAMM agreed to be responsible for paying claims from health care providers for services to M + C patients. NAMM then contracted with various health care providers to offer these services. Each of the Hospitals had such a contract with NAMM.

NAMM became insolvent and never responded to approximately 6,000 claims from the Hospitals totaling over $13 million. The Hospitals then demanded that

---

**1.** None of the contracts involved in this case are part of the record on appeal, and the parties are not clear whether Aetna itself or NYLCare 65 contracted with the HCFA. As it does not affect our analysis, for ease of reference, we will assume Aetna is the contracting party. We will refer to Aetna as the M + C organization and will not refer to NYLCare 65 as a separate entity but included in the term "Aetna."

**2.** A capitation payment is "a fixed per enrollee per month amount paid for contracted services without regard to the type, cost, or frequency of services furnished." 42 C.F.R. § 422.350(b) (2003).

Aetna pay the claims on the theory that Aetna was statutorily liable to pay for the health care services provided to its patients, despite having contracted with NAMM to perform that service. Aetna refused to pay.

The Hospitals sued Aetna for breach of contract, quantum meruit, breach of fiduciary duty, and to collect on accounts. The trial court granted Aetna's motion to dismiss for lack of subject matter jurisdiction because the Hospitals did not first pursue their claims through the administrative process established under the Medicare program. The Hospitals claim this was error because, for a variety of reasons, this administrative process does not apply to them.

### III. ANALYSIS

### A. The Hospitals' claims arise under the Medicare Act.

■■■ Courts have subject matter jurisdiction to review claims "arising under" the Medicare Act only after the claimant unsuccessfully seeks payment and then exhausts the administrative remedies provided under the Act. *See Heckler v. Ringer,* 466 U.S. 602, 614–15, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). A claim arises under the Medicare Act if "both the standing and the substantive basis for the presentation" of the legal claim is the Act *or* if it is "inextricably intertwined" with a claim for benefits. *See id.* at 614–15, 624, 104 S.Ct. 2013. In applying this standard, it does not matter how a claim is characterized. If, "at bottom," the plaintiff seeks Medicare benefits, the claim arises under the Act and must go through the administrative process. *Id.* at 614, 104 S.Ct. 2013.

The Supreme Court has instructed that the term "arising under" be construed "quite broadly." *Id.* at 615, 104 S.Ct. 2013. This promotes the important policy considerations of avoiding premature interference with agency processes and uniformity

and consistency in administration of the Medicare program. *See Weinberger v. Salfi,* 422 U.S. 749, 765, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975) ("Exhaustion is generally required as a matter of preventing premature interference with agency processes, so that the agency may function efficiently and so that it may have an opportunity to correct its own errors, to afford the parties and the courts the benefit of its experience and expertise, and to compile a record which is adequate for judicial review."); *Maximum Home Health Care, Inc. v. Shalala,* 272 F.3d 318, 321 (6th Cir.2001) ("The purpose of a regulatory scheme such as Medicare is to provide uniform rules by which all participants may be treated equally."); *Friedrich v. Sec'y of Health & Human Servs.,* 894 F.2d 829, 837 (6th Cir.1990) ("National standards are essential if there is to be uniformity and equality in the administration of Medicare.").

Such uniformity is crucial on decisions regarding Medicare coverage so that a Medicare patient's right to health care services does not vary from state to state. Thus, all coverage decisions must go through the administrative procedures of the Medicare program. *See* 42 C.F.R. § 422.402(b)(3) (2003) (stating that the Medicare Act preempts all state law coverage determinations); Medicare + Choice Program, 65 Fed.Reg. at 40261 (explaining that state courts are preempted from deciding any claim "in which the legal issue before the court is ... whether services are covered under the terms of an M + C contract"); Medicare Program; Establishment of the Medicare + Choice Program, Interim Final Rule with Comment Period, 63 Fed.Reg. 34968, 35013 (June 26, 1998) (noting that the Medicare appeals process is the exclusive remedy for any dispute over whether a service is covered under a

Medicare contract).[3] For these important policy reasons, we resolve any doubts in favor of requiring claims to first proceed through the administrative process. *See New York v. Lutheran Ctr. for the Aging, Inc.*, 957 F.Supp. 393, 397 (E.D.N.Y.1997) (holding that "regardless of whether the services at issue are ultimately determined to be covered by Medicare, they still must be litigated through the administrative process").

█ We hold that the Hospitals' claims arise under the Medicare Act. Though their claims are characterized under state law, such as for breach of contract, they are "inextricably intertwined" with a claim for benefits because, "at bottom," they are seeking payment for services provided to Medicare patients. *Heckler*, 466 U.S. at 614, 104 S.Ct. 2013. As such, the Hospitals were required to first exhaust the administrative process. *See id.* Though *Heckler* was decided under Parts A and B of Medicare, at least three other courts have applied this same analysis to claims under Part C, including one involving NAMM, the very same intermediary in this case. *See In re Heritage Southwest Med. Group, P.A.*, 309 B.R. 916 (Bankr. N.D.Tex.2004); *Foley v. Southwest Tex. HMO, Inc.*, 226 F.Supp.2d 886 (E.D.Tex. 2002); *Lifecare Hosps., Inc. v. Ochsner Health Plan, Inc.*, 139 F.Supp.2d 768 (W.D.La.2001). We agree with their analysis of this issue and conclude that the trial court did not have subject matter jurisdiction over the Hospitals' claims.

## B. The Hospitals are not excused from exhausting administrative remedies.

The Hospitals argue that, for a variety of reasons, the administrative process does not apply to them and their claims. A detailed description of the administrative process is necessary to put the Hospitals' arguments in context.

### 1. The administrative process

The Medicare program contains two separate administrative procedures that are relevant in this case: one for pure payment disputes and one for appealing "organization determinations" from the M + C organization.

When processing payment claims from noncontract providers—that is, providers with no contractual relationship with an M + C organization—an M + C organization must provide "prompt payment." 42 U.S.C. § 1395w–27(f)(1); 42 C.F.R. § 422.520(a) (2003). The standard for assessing whether payment is prompt is set forth in federal regulations. *See* 42 C.F.R. § 422.520(a). When a payment dispute occurs, the provider can seek relief from the HCFA. If, after notice and an opportunity for a hearing, the HCFA determines an M + C organization has failed to make prompt payment, it can provide direct payment of the claim and then reduce the payments the HCFA makes to the M + C organization pursuant to their contract. 42 U.S.C. § 1395w–27(f)(2); 42 C.F.R. § 422.520(c) (2003). This administrative procedure is not available for pure pay-

3. The Hospitals claim that Aetna must also prove that federal law preempts their claims before they can be required to exhaust administrative remedies. The Hospitals cite no authority for this proposition. Preemption and subject matter jurisdiction are distinct inquiries. *See Baker v. IBP, Inc.*, 357 F.3d 685, 688 (7th Cir.2004) ("[P]reemption is a defense and thus does not affect subject-matter juris- diction."). Because we have determined that the Hospitals' failure to exhaust administrative remedies deprived the trial court of subject matter jurisdiction, we need not also decide whether their claims are preempted. Nevertheless, regulations and commentary regarding preemption are useful in demonstrating the intent that all coverage issues must go through the administrative process.

ment disputes between an M+C organization and a contract provider because although the contract between the M+C organization and the provider must contain a prompt payment provision, the content of that provision is determined by the contract and is therefore a matter of state law. *See* 42 C.F.R. § 422.520(b) (2003).

Procedures for M+C organizations to determine whether a Medicare patient is entitled to receive a service and the amount, if any, the patient is required to pay are called "organization determinations." 42 U.S.C. § 1395w–22(g)(1)(A); 42 C.F.R. § 422.566(a), (b) (2003).[4] Disputes over organization determinations are governed by a different and more elaborate administrative procedure. Patients can request a reconsideration of an adverse organization determination and can then appeal through several steps, concluding with judicial review in federal court in some cases. 42 U.S.C. § 1395w–22(g)(2)–(5); 42 C.F.R. §§ 422.578–.626 (2003). Though this process is obviously designed to protect patients' rights regarding decisions such as coverage, providers can have an interest as well. As such, providers can request an organization determination and, in some circumstances, are parties to the

organization determination with full rights of appeal. *See* 42 C.F.R. §§ 422.574(b), (d), 422.578–.626 (2003).[5]

## 2. The Hospitals must exhaust administrative remedies.

■ The Hospitals argue that they are not required to resort to the administrative process because (1) the administrative process applies only to patients and not providers, (2) this is not a coverage dispute, and (3) no organization determination was made to invoke the administrative process. We disagree with each of these arguments.

■ The Hospitals' claim that the administrative process does not apply to providers is belied by the plain language of the statute and regulations. As discussed above, noncontract providers can complain to the HCFA about pure payment disputes. In the organization determination appeals process, providers may request an organization determination, and providers who are assignees of the patient or otherwise have an appealable interest are parties and may appeal an adverse organization determination. *See* 42 C.F.R. §§ 422.566(c), 422.574(b), (d) (2003); *see*

4. The regulations define an organization determination in pertinent part as follows:

> An organization determination is any determination made by an M+C organization with respect to any of the following:
> ....
> (2) Payment for any other health services furnished by a provider other than the M+C organization that the enrollee believes—
> (i) Are covered under Medicare; or
> (ii) If not covered under Medicare, should have been furnished, arranged for, or reimbursed by the M+C organization.
> (3) The M+C organization's refusal to provide or pay for services, in whole or in part, including the type or level of services, that the enrollee believes should be furnished or arranged for by the M+C organization.
> ....

42 C.F.R. § 422.566(b).

5. Section 422.574, which defines parties to the organization determination, states as follows:

> The parties to the organization determination are—
> (a) The enrollee (including his or her authorized representative);
> (b) An assignee of the enrollee (that is, a physician or other provider who has furnished a service to the enrollee and formally agrees to waive any right to payment from the enrollee for that service);
> (c) The legal representative of a deceased enrollee's estate; or
> (d) Any other provider or entity (other than the M+C organization) determined to have an appealable interest in the proceeding.
> 42 C.F.R. § 422.574 (2003).

*also* Establishment of the Medi-care + Choice Program, 63 Fed.Reg. at 35026 (stating the provision allowing any other provider with an appealable interest to be a party is intended to be broad).[6] Though the interests of patients is the primary focus of this administrative process, providers have subsidiary interests (such as in being able to provide services and in being paid for them) that are clearly contemplated and specifically provided for in this process. Thus, a contract provider in a payment dispute with an M + C organization has an administrative remedy *if that dispute is in conjunction with a* patient-focused dispute such as coverage. Three other courts considering Medicare + Choice provider payment disputes have also required the providers to exhaust administrative remedies. *See Heritage,* 309 B.R. at 919–20; *Foley,* 226 F.Supp.2d at 903–07; *Lifecare,* 139 F.Supp.2d at 770–72.

■ The Hospitals also contend that this is not a coverage dispute but is merely a prompt payment dispute and therefore, as contract providers, they have no administrative remedies to exhaust. The Medicare Act mandates that providers supplying services pursuant to a contract with an M + C organization cover at least all services covered under Medicare Parts A and B. 42 C.F.R. § 422.100(a), (c) (2003). The Texas statute that provides the substance of Aetna's prompt payment obligation in this case states that an HMO that violates its prompt payment obligations is liable "for the full amount of billed charges ..., less ... any charge for a service that is not covered by the health care plan."[7] Thus, even if Aetna violated its prompt payment obligation, according to the plain wording of the statute, it may still assert a defense to payment if the services are not covered.[8] If coverage issues are even possible, for the important policy reasons promoted by the administrative process and ensuring uniformity of Medicare coverage, the dispute must go through the administrative process. *See Weinberger,* 422 U.S. at 765, 95 S.Ct. 2457; *Maximum Home Health Care,* 272 F.3d at 321; *Friedrich,* 894 F.2d at 837; *Lutheran Ctr. for the Aging,* 957 F.Supp. at 397.

In a related argument, the Hospitals assert that since the administrative process is designed for coverage-type issues, other matters, such as contract interpretation, are beyond the HCFA's expertise, and therefore exhaustion would be futile.

**6.** The Hospitals claim that although they may be assignees of their patients, they are not pursuing any *rights* they might have as assignees but rather their own separate contractual right to payment, and therefore are not proper parties to any organization determination under 42 C.F.R. § 422.574(b). Aetna responds that the Hospitals are most certainly assignees since they are not seeking payment from their patients and that they cannot choose to disregard this status to avoid the administrative process. We need not resolve this issue because we conclude that the Hospitals have an appealable interest in the proceeding and therefore are parties under 42 C.F.R. § 422.574(d).

**7.** At the time this lawsuit arose, this prompt payment language was found at Tex.Rev.Civ. Stat. Ann. art. 20A.18B. The statutory prompt payment scheme has since been repealed and recodified at Tex. Ins.Code Ann. §§ 843.336–.353 (Vernon 2004–2005). *See* Act of May 1, 2001, 77th Leg., R.S., ch. 1419, 2001 Tex. Gen. Laws 3568.

**8.** At oral argument, the Hospitals asserted that if Aetna has not promptly paid, it no longer may raise a coverage defense. However, it provided no authority for that statement, and we have been unable to find any. Rather, based on the clear wording of the applicable statute, Aetna is not liable for "any charge for a service that is not covered by the health care plan." Tex.Rev.Civ. Stat. Ann. art. 20A.18B(f) (repealed). This makes sense because presumably the contract obligates the provider only to provide services covered by the contract.

Even if some of their claims are not within the typical scope of the HCFA's review, the agency must first be allowed to consider those issues on which it has expertise before judicial review; otherwise, the exhaustion process would be undermined. *See Kaiser v. Blue Cross of Cal.*, 347 F.3d 1107, 1115 & n. 4 (9th Cir.2003); *see also Lifecare*, 139 F.Supp.2d at 773 ("While it is clear that Lifecare would prefer an immediate appeal to the district court rather than the often lengthy administrative review process, in light of the fact that Lifecare may, in fact, seek judicial review after pursuing its administrative remedies, the court holds that it would not be an exercise in futility for Lifecare to comply with the Medicare Act's exhaustion requirements.").

Finally, the Hospitals claim that no organization determination occurred, which is a necessary precursor of invoking the procedure for challenging an adverse organization determination. They contend that NAMM never processed the claims and that nonpayment by default is not an organization determination. Even if NAMM did not make an organization determination by failing to pay the Hospitals' claims,[9] Aetna clearly made one when it refused the Hospitals' subsequent demand of payment for services provided to Medicare patients. *See Heritage*, 309 B.R. at 920; *Lifecare*, 139 F.Supp.2d at 772–73; 42 C.F.R. § 422.566(b)(2), (3).

 The Hospitals point to two authorities they claim support their argument that their dispute with Aetna is not subject to the administrative process. First, four of the five Hospitals submitted a letter to the HCFA requesting that the agency intervene and hold Aetna liable on the claims NAMM failed to pay. The agency's response stated that "[t]his type of contract dispute between parties is an issue for the state judiciary to decide" because the regulations "do not ... contemplate Federal intervention in provider payment disputes involving contracted M + C providers that voluntarily enter into contracts with M + C organizations." That response is accurate if the parties' dispute is solely a prompt payment issue. *See* 42 U.S.C. § 1395w–27(f); 42 C.F.R. § 422.520. However, the HCFA, without the benefit of Aetna's perspective on the dispute, apparently did not consider the potential coverage issues, which we have concluded must be resolved through the portion of the administrative process governing organization determinations. Further, the Hospitals did not request the HCFA's opinion regarding exhaustion of administrative remedies, and the HCFA never mentioned the issue in its responding letter. In any event, we are not bound by an informal, ex parte letter from an agency. *See Lifecare*, 139 F.Supp.2d at 772–73.

 Second, the Hospitals rely on a sentence from an HCFA manual that says "contracted providers do not have appeal rights." Medicare Managed Care Manual, ch. 13, § 70.1, *available at* http://www.cms.hhs.gov/manuals/. This blanket statement that contract providers have no right of appeal is in direct conflict with the regulations. Though the administrative procedure for pure payment disputes is not available to contract providers, the regulation defining parties to an organization determination, who by definition have appeal rights, contains no such limitation on a provider's rights, and the manual makes no attempt to explain its position. *Compare* 42 C.F.R. § 422.520, *with* 42 C.F.R. § 422.574. If an agency manual conflicts with regulations, the regulations

9. *But see* 42 C.F.R. § 422.568(f) (2003) ("If the M + C organization fails to provide the enrollee with timely notice of an organization determination as specified in this section, this failure itself constitutes an adverse organization determination and may be appealed.").

control. *See Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748, 124 S.Ct. 2230, 2238, 159 L.Ed.2d 46 (2004) ("[N]either an unreasoned statement in the manual nor allegedly longstanding agency practice can trump a formal regulation with the procedural history necessary to take on the force of law.").

The Hospitals' claims "arise under" the Medicare Act, which means the Hospitals must exhaust administrative remedies before litigating their claims in court. The Hospitals were not excused from exhausting the administrative process, and their failure to do so deprived the trial court of subject matter jurisdiction. Therefore, we affirm the judgment of the trial court dismissing this action for lack of jurisdiction.[10]

---

**10.** Two days after we issued our original opinion, the Fifth Circuit issued its opinion in *RenCare, Ltd. v. Humana Health Plan of Texas, Inc.*, 395 F.3d 555 (5th Cir.2004). The court considered a payment dispute between an M+C organization, Humana, and a contract provider, RenCare, over reimbursement for end stage renal dialysis services RenCare provided to Humana patients. *Id.* at 556–57. The court determined that the administrative process did not apply to such claims because these claims were not "inextricably intertwined" with a claim for Medicare benefits and therefore did not "arise under" the Medicare Act. *Id.* at 557–59.

The Hospitals moved for rehearing, arguing that our opinion is inconsistent with *RenCare* and therefore should be withdrawn. We disagree. In *RenCare*, the dispute appears to have been a pure payment dispute with no mention of any potential coverage issues. *Id.* at 557. By contrast, Aetna has a potential coverage defense to these 6,000 claims. The potential of a coverage dispute is critical to our analysis that the claims arise under the Medicare Act and therefore must first proceed through the administrative process. The *RenCare* opinion does not consider coverage issues and is therefore distinguishable.

Further, the crux of the court's analysis is a provision in RenCare's contract with Humana that waived RenCare's right to payment from its enrollees, which meant that Humana's patients had no financial interest in the dispute. *Id.* at 558. We cannot determine if we would reach the same conclusion as the Fifth Circuit because the parties have not provided us with the contracts between Aetna and the Hospitals. The Hospitals argue that such a waiver must be included in their contracts, citing 42 C.F.R. § 422.502(g)(1)(i). That provision states that an M+C organization must make arrangements to protect enrollees "from incurring liability ... for payment of any fees that are the legal obligation of the M+C organization." As discussed above, given that Aetna need not pay any fee for a service that is not covered by the contracts, this regulation does not address who would be liable if Aetna successfully asserted a coverage defense.

In our original opinion, we cited *Sono Tech Enters., Inc. v. New Orleans Reg'l Physician Hosp.*, No. Civ.A. 04–2024, 2004 WL 2115609, at *3–4 (E.D.La. Sept.13, 2004), which held that a provider's claim against M+C organization was properly removed to federal court because it arises under the Medicare Act, as additional support for our analysis. In an unpublished order, the court recently reconsidered and reversed its prior ruling in light of *RenCare*, noting simply that *RenCare* "forecloses any argument by Defendants that Plaintiff's claims arise under the Medicare Act." Neither the order nor the original opinion provide much detail about the facts of the case, but it does appear that coverage was an issue in *Sono Tech*. *See id.* at *4 ("Sono Tech is a medical care provider seeking payment for services that Defendants contend is not covered by Medicare."). Thus, to the extent *Sono Tech* can be read to conclude that *RenCare* controls when coverage is at issue, we reject its analysis.