CHRISTUS HEALTH GULF COAST, Christus Health Southeast Texas, Gulf Coast Division, Inc., Memorial Hermann Hospital System And Baptist Hospitals of Southeast Texas, Petitioners,

v.

AETNA, INC. and Aetna Health, Inc., Respondents.

No. 05–0710.

Supreme Court of Texas.

Argued Dec. 6, 2006.

Delivered Aug. 31, 2007.

Rehearing Denied Nov. 30, 2007.

Scott M. Clearman, Brian D. Walsh, McClanahan & Clearman, L.L.P., David E. Warden and Eric P. Chenoweth, Yetter & Warden, L.L.P., Houston, for Petitioners.

John B. Shely, Dimitri Zgourides, Jeffrey D. Migit and Kendall M. Gray, Andrews & Kurth L.L.P., Houston, for Respondents.

John Barrett Scott, Scott Yung LLP, Dallas, for Texas Gulf Coast HMO, Inc.

Charles W. Bailey, Austin, for amicus curiae Texas Hospital Association.

Isaac J. Lidsky, United States Department of Justice, Washington, DC, Daniel Manuel Castillo, Asst. U.S. Atty., Austin, for amicus curiae United States Department of Health and Human Services.

Chief Justice JEFFERSON delivered the opinion of the Court.

We must decide whether a Texas court has jurisdiction over certain state-law claims asserted by hospitals against a Medicare health maintenance organization, or whether the hospitals must first proceed through the federal administrative machinery. We conclude that the hospitals in this case have alleged facts supporting the trial court's jurisdiction. Accordingly, we reverse the court of appeals' judgment and remand to the trial court for further proceedings.

## I

### The Medicare Advantage Program

Medicare was established in 1965 as part of the Social Security Act. 42 U.S.C. §§ 1395–1395ggg (2000). It is administered by the Centers for Medicare and Medicaid Services ("CMS"), an agency whose mission is to "serve Medicare and Medicaid beneficiaries,"[1] and provides health insurance for most Americans over sixty-five, for certain disabled persons under sixty-five, and for persons with end-stage renal disease. 42 U.S.C. § 1395c.

In 1997, Medicare was amended to include Part C, also known as the Medicare Advantage program.[2] Medicare + Choice Program, 65 Fed.Reg. 40170, 40171 (June 29, 2000). The Medicare Advantage program provides Medicare beneficiaries with "a wider range of health plan choices through which to obtain their Medicare benefits." Establishment of the Medicare Advantage Program, 70 Fed.Reg. 4588, 4589 (Jan. 28, 2005).

Under Medicare Advantage, CMS contracts with health maintenance organizations and other private entities to provide health care services to Medicare enrollees. *Id.* at 4589–90. Those that enter into such contracts with CMS are called Medicare Advantage organizations, 42 C.F.R. § 422.2, and there are detailed requirements for entities that wish to qualify. 42 C.F.R. § 422.503. Once CMS and a Medicare Advantage organization enter into a contract, CMS makes capitation payments[3] to Medicare Advantage organizations for enrollee health care services. 42 C.F.R. § 422.304(a). Upon payment from CMS, the Medicare Advantage organization "assume[s] full financial risk ... for the provision of the health care services for which benefits are required to be provided," 42 U.S.C. § 1395w–25(b), and "must adopt and maintain arrangements satisfactory to CMS to protect its enrollees from incurring liability (for example, as a result of an organization's insolvency or other financial difficulties) for payment of any fees that are the legal obligation of the

1. CMS was previously known as the Health Care Financing Administration. Press Release, Department of Health and Human Services, The New Centers for Medicare and Medicaid Services (CMS) (June 14, 2001), *available at: http://www.hhs.gov/news/press/2001pres/20010614a.html; see also* Acquisition Regulation for Department of Health and Human Services, 70 Fed.Reg. 38, 39 (Jan. 3, 2005).

2. The Medicare Advantage program replaced the Medicare + Choice program. 70 Fed. Reg. 4588, 4741 (Jan. 28, 2005).

3. A capitation payment is "a fixed per enrollee per month amount paid for contracted services without regard to the type, cost, or frequency of services furnished." 42 C.F.R. § 422.350(b) (2006).

[Medicare Advantage] organization." 42 C.F.R. 422.504(g)(1). Medicare Advantage organizations may contract with third parties to provide administrative and health care services to enrollees. 42 C.F.R. § 422.214(a). Contracts between Medicare Advantage organizations or their delegates and downstream providers are freely negotiated, with very few exceptions. *See, e.g.,* 42 C.F.R. § 422.504(g)(1)(i) (requiring Medicare Advantage organizations to "[e]nsure that all contractual or other written arrangements with providers prohibit the organization's providers from holding any beneficiary enrollee liable for payment of [fees that are the legal obligation of the Medicare Advantage organization.]").

## II

### The Hospitals, Aetna, and NAMM

Aetna[4] owned NYLCare, an HMO that became a Medicare Advantage organization by virtue of its contract with CMS.[5] NYLCare contracted with North American Medical Management of Texas[6] (NAMM) to administer the plan. CMS made capitation payments to Aetna which, in turn, made monthly payments to NAMM. NAMM was required to deposit the payments into a fund that was designated to pay covered claims for health care services rendered by health care providers to NYLCare members. NAMM then contracted with health care providers, including Christus Health Gulf Coast; Christus Health Southeast Texas; Gulf Coast Division, Inc.; Memorial Hermann Hospital System; and Baptist Hospitals of Southeast Texas (collectively, the Hospitals), to provide services to NYLCare enrollees.

The Hospitals allege that NAMM grossly mismanaged its accounting and failed to track claims accurately. Eventually, NAMM stopped paying the Hospitals for their services. In August 2000, NAMM notified the Hospitals and NYLCare that it was no longer able to satisfy its financial obligations, and on August 31, 2000, the Texas Department of Insurance placed NAMM in supervision conservatorship. Aetna (through NYLCare) assumed responsibility for institutional claims incurred by NYLCare members for covered services rendered on or after August 17, 2000. The Hospitals sought payment from Aetna for services rendered prior to that date, but Aetna refused the "numerous demands" for payment.

On December 5, 2000, four of the five Hospitals wrote CMS, describing in detail the situation and asking CMS to intervene to require Aetna to pay the Hospitals for the unreimbursed services provided to enrollees. On March 30, 2001, CMS responded, in a four-page, single-spaced letter signed by the Acting Director of the Medicare Managed Care Group. The letter analyzed the Hospitals' claims and concluded:

> [Y]ou overstate [CMS's] authority to hold [Aetna] responsible for unpaid claims in this instance. . . . This type of contract dispute is an issue for the state judiciary to decide.

---

4. "Aetna" refers to Aetna, Inc. and Aetna Health, Inc., respondents herein.

5. As a Medicare Advantage organization, NYLCare was authorized to provide Medicare benefits to participants in its NYLCare 65 plan. For ease of reference, we use "NYLCare" to refer both to NYLCare and to NYLCare 65.

6. Petitioners assert that NAMM was composed of two entities: IPA Management Associates, L.P. d/b/a North American Medical Management—Texas and IPA Management Services, Inc. We use "NAMM" to refer to both.

. . .

[Medicare Advantage] regulations clearly limit [CMS]'s ability to intervene in payment disputes between [Medicare Advantage] organizations and their contracted [Medicare Advantage] providers. In fact, the existence of provider contracts that can be enforced by the courts is why the Congress limited [CMS]'s regulatory authority in comparison to those afforded non-contracted providers.

The Hospitals contend that they also attempted to pursue remedies through the Texas Department of Insurance, but the agency denied jurisdiction over the matter and referred the Hospitals to the Texas court system.

The Hospitals sued Aetna in Harris County district court, alleging $13,067,759.19 in unpaid services, for which they asserted claims under the Texas Insurance Code, suit on an account, breach of contract, breach of fiduciary duty, and quantum meruit. Aetna answered and filed a third-party petition against NAMM. Aetna sought contribution and indemnity, alleging that NAMM "breached [its agreement with Aetna] and its contracts with each of the [Hospitals] by failing to pay for covered services rendered to NYLCare 65 members" before NAMM's insolvency.

Aetna then moved to dismiss the Hospitals' claims, contending that they were governed exclusively by the Medicare Act and that because the Hospitals had not pursued Medicare's administrative remedies, the trial court lacked subject matter jurisdiction over the claims. The Hospitals responded, asserting that under the Texas Insurance Code, Aetna was directly liable to the Hospitals for NAMM's failure to pay. The Hospitals argued that enrollees, not providers, were required to exhaust remedies before suing and that

"[t]he administrative review process . . . has no application to the [H]ospitals and, in fact, provides them with no way to seek an administrative review."

On October 2, 2003, the trial court heard and granted the plea to the jurisdiction, dismissing without prejudice the Hospitals' claims. The Hospitals appealed, and the court of appeals affirmed the trial court's judgment. 167 S.W.3d 879. The court concluded that the Hospitals' claims arose under the Medicare Act and that the Hospital therefore had to exhaust administrative remedies before suing in state court.

The Hospitals moved for rehearing, alleging that an opinion issued by the United States Court of Appeals for the Fifth Circuit two days after the court of appeals issued its opinion, was inconsistent with the court of appeals' holding. *See Ren-Care, Ltd. v. Humana Health Plan of Tex., Inc.*, 395 F.3d 555, 557–560 (5th Cir. 2004). The court denied the motion for rehearing and issued an opinion on rehearing in which it discussed and distinguished *RenCare*. 167 S.W.3d at 888 n. 10. We granted the Hospitals' petition for review.[7] 49 Tex. Sup.Ct. J. 966 (Sept. 1, 2006).

### III

### Discussion

### A

### Plea to the Jurisdiction

█ As an initial matter, we note that this case comes to us on a plea to the jurisdiction. As such, the abbreviated record—a single volume of trial court pleadings and the reporter's record from the non-evidentiary hearing on the jurisdictional plea—leaves many questions unanswered. For example, none of the con-

**7.** The Texas Hospital Association and the United States Department of Health and Human Services ("HHS") submitted amicus curiae briefs. Tex.R.App. P. 11.

tracts referred to are in the record. Nor is there evidence of the types of services rendered to the NYLCare enrollees; the sparse record simply shows unpaid balances totaling some thirteen million dollars. Because this is a jurisdictional plea, however, we construe the pleadings liberally in favor of the plaintiffs and look to the pleaders' intent. *Texas Dept. of Parks and Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004). When a plea to the jurisdiction challenges the pleadings, we determine if the pleader has alleged facts that affirmatively demonstrate the court's jurisdiction to hear the cause. *Id.*

## B

### Medicare Administrative Remedies

In a case strikingly similar to this one, the United States Court of Appeals for the Fifth Circuit Court recently considered whether a healthcare provider that contracted with a Medicare Advantage organization had to pursue administrative remedies before filing suit. *RenCare, Ltd. v. Humana Health Plan of Tex., Inc.,* 395 F.3d 555 (5th Cir.2004). Humana, a Medicare Advantage HMO, contracted with RenCare to provide kidney dialysis services to Humana's enrollees. *Id.* at 556–57. Humana and RenCare then disagreed about reimbursement for end-stage renal dialysis services that RenCare provided to the enrollees, and RenCare sued Humana in Texas state court, alleging breach of contract, detrimental reliance, fraud, and violations of state law. *Id.* at 557. Humana removed the claims to federal district court, arguing that RenCare's claims were preempted by the Medicare Act. The federal district court ultimately dismissed RenCare's claims relating to Medicare Advantage enrollees, finding that RenCare had failed to exhaust its administrative remedies under the Medicare Act. *Id.*

The Fifth Circuit reversed, concluding that: (1) RenCare's claims did not arise under the Medicare Act, and (2) there were no administrative remedies for RenCare to exhaust. *Id.* at 558. As to the first issue, the court considered *Heckler v. Ringer,* "the seminal case discussing whether a claim 'arises under' the Medicare Act." *Id.* at 558 (citing *Heckler v. Ringer,* 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984)). In *Heckler,* three individuals who had been denied reimbursement for bilateral carotid body resection ("BCBR") surgery sued the Secretary of Health and Human Services. The plaintiffs sought an invalidation of the Secretary's policy against BCBR reimbursement, a declaration that the surgery expenses were reimbursable, and an injunction barring the Secretary from forcing claimants to pursue administrative appeals in order to obtain payment. 466 U.S. at 611, 104 S.Ct. 2013. The Supreme Court concluded that because the claims were not "anything more than, at bottom, a claim that they should be paid," they were "inextricably intertwined" with a claim for benefits and therefore arose under the Medicare Act. *Id.* at 614, 104 S.Ct. 2013.

The Fifth Circuit, distinguishing *Heckler,* concluded that RenCare "present[ed] a vastly different situation." *RenCare,* 395 F.3d at 558. There, Medicare enrollees were not denied services or reimbursement for services. The court noted that RenCare waived its right to seek payment from enrollees, and the government, having tendered its capitation payment, no longer had a financial interest in the case. *Id.* Thus, Humana bore the ultimate responsibility for providing services to its Medicare Advantage enrollees, and "[w]ith the government's risk extinguished, any dispute over payment to RenCare is solely between RenCare and Humana." *Id.* at 559.

While the Fifth Circuit's holding on this point is persuasive,[8] it is unclear whether *Heckler's* "arising under" test even applies to Medicare Advantage claims. *See* Stephen M. Elwell, Note, *Preemption of Contract Claims by the Medicare Act: An Analysis of the Recent Holding in Lifecare Hospitals v. Ochsner Health Plan,* 24 REV. LITIG. 125, 127 (2005) (noting that "[c]ourts must also decide whether the test in *Heckler* applies to claims arising under the Medicare Advantage program" and noting that *Heckler* was based on claims arising under the traditional Medicare program, not Medicare Advantage). Amicus HHS urges that *Heckler* is an "unfortunate ... red herring" that has been interjected into this dispute and that "[t]he significance of the 'arising under' analysis set forth in *Heckler* is relevant only for purposes of assessing subject matter jurisdictional issues in federal court when plaintiffs pursue 'action[s] against the United States, the [Secretary of HHS], or any officer or employee thereof.'" 42 U.S.C. § 405(h) (as applied to Medicare by 42 U.S.C. § 1395ii). Aetna contends that it should be considered an "officer or employee" of the United States or the Secretary and, therefore, that *Heckler's* "arising under" test controls.

█ We need not decide that question today, however, as we agree with the *RenCare* court's second conclusion: "it appears that the administrative review process attendant to Part C does not extend to claims in which an enrollee has absolutely no interest." *Id.* The court noted that Part C and CMS's implementing regulations establish mandatory administrative "appeals procedures" to resolve disputes over "organization determinations."[9] *Id.* (citing 42 U.S.C. § 1395w–22(g); 42 C.F.R. § § 422.560–422.622). An organization determination is a decision by a Medicare Advantage organization "regarding the benefit an *enrollee* is entitled to receive under [a Medicare Advantage] plan ... and the amount, if any, that the *enrollee* is required to pay for a health service." 42 C.F.R. § 422.566(a) (emphasis added). More specifically, an organization determination may be the Medicare Advantage organization's "refusal to provide or pay for services, in whole or in part, ... that the *enrollee* believes should be furnished or arranged for by the [Medicare Advantage] organization." 42 C.F.R. § 422.566(b)(3) (emphasis added). Enrollees have a right to a timely organization determination, 42 C.F.R. § 422.562(b)(2), and a right to appeal that decision through several levels of review. 42 C.F.R. § 422.562(b)(4)(i)-(vi). However, if an *"enrollee* has no further liability to pay for services that were furnished by [a Medicare Advantage] organization, a determination regarding these services is not subject to appeal." 42 C.F.R. § 422.562(c)(2) (emphasis added).

The court concluded:

As is evident from the regulations, the administrative review process focuses on enrollees, not health care providers, and is designed to protect enrollees' rights to

---

8. *See Penrod Drilling Corp. v. Williams,* 868 S.W.2d 294, 296 (Tex.1993) ("While Texas courts may certainly draw upon the precedents of the Fifth Circuit ... in determining the appropriate federal rule of decision, they are *obligated* to follow only higher Texas courts and the United States Supreme Court.")

9. Disputes between enrollees and Medicare Advantage organizations or any other entity or individual through which the Medicare Advantage organization provides health care services, over any other matter are not subject to the same appeals process as organizational determinations, but instead have their own "grievance procedure." 42 C.F.R. §§ 422.562(a)(1)(i), 422.564.

Medicare benefits. Here, Humana's failure to pay RenCare is not an organization determination subject to the mandatory exhaustion of administrative remedies. No enrollee has requested an organization determination or appeal. No enrollee has been denied covered service or been required to pay for a service. Rather, the [Medicare Advantage] enrollees in this case bear no financial risk inasmuch as they have already received the services for which RenCare seeks reimbursement. In fact, there is a complete absence of [Medicare Advantage] beneficiary interest in this dispute. The only interest at issue is RenCare's interest in receiving payment under its contract with Humana.

*RenCare,* 395 F.3d at 559–60.

Here, although the parties did not contract directly with each other, each had agreements with NAMM. Consequently, their dispute concerns not whether the services were covered under Medicare, but rather who should bear the loss associated with NAMM's failure to pay. Aetna staunchly alleges it discharged its duties by making monthly payments to NAMM; the Hospitals, on the other hand, assert that Aetna is nonetheless ultimately responsible under the Texas Insurance Code and federal law.

■ Aetna asserts that NAMM's (and subsequently Aetna's own) failure to pay the claims is tantamount to a denial of coverage, and the Hospitals should have exhausted administrative remedies under the Medicare Act before proceeding in state court. We disagree. Aetna's contention that the Hospitals must first seek an administrative determination of some 6,000 claims misconstrues a claim seeking payment for services provided to Medicare patients as a claim for Medicare benefits. That is, failing to pay due to insolvency or a dispute about who is contractually obli-

gated to pay is different from failing to pay due to lack of coverage. The Hospitals are not challenging an organization determination, as they must to fall under the mandatory statutory scheme, and the court of appeals erred in concluding otherwise. *See* 42 C.F.R. § 422.566(b); 167 S.W.3d at 887. As in *RenCare,* no enrollee has been denied covered services or been required to pay for a service, and the federal government's risk has been extinguished. *RenCare,* 395 F.3d at 559. Aetna's petition against NAMM asserted that NAMM breached its agreement with Aetna by failing to pay for "covered services"; Aetna's contention that its refusal to pay now means there is no coverage confuses Medicare coverage with Aetna's potential liability for NAMM's default. The federal administrative scheme exists, first and foremost, to protect enrollees' rights to health care, not to act as a de facto claims administrator for Medicare Advantage organizations and their delegates. Amicus curiae HHS urges that requiring the Hospitals to exhaust administrative remedies before coverage decisions have been made would turn the administrative scheme on its head, and we agree.

Nor is it dispositive that there apparently was no contract directly between Aetna and the Hospitals. The regulations make it clear that enrollees cannot incur liabilities for payment of any fees that the Medicare Advantage organization is legally obligated to pay. 42 C.F.R. 422.504. This prohibition on enrollee liability extends to providers who contract directly with the Medicare Advantage organization as well as those that do not. *Id.* § 422.504(g) (Medicare Advantage organization must "[e]nsure that all contractual or other written arrangements with providers prohibit the organization's providers from holding any beneficiary enrollee liable for payment" of fees that are the legal obligation

of the [Medicare Advantage] organization and "[i]ndemnify the beneficiary enrollee for payment of any fees that are the legal obligation of the Medicare Advantage organization for services furnished by providers that do not contract, or that have not otherwise entered into an agreement with the [Medicare Advantage] organization, to provide services to the organization's beneficiary enrollees"). As CMS told the Hospitals in its March 30, 2001 letter, "the lack of a contract directly with an HMO does not necessarily exempt a provider from the prohibition against balance billing," and "the 42 C.F.R. 422.502(g)(1) provision applies to contracted downstream providers." As in *Ren-Care,* therefore, enrollees are protected from liability for fees that the Medicare Advantage organization must pay, and the only interest at issue here is the Hospitals' interest in receiving payment from the Medicare Advantage organization. Whether those fees are in fact Aetna's legal obligation is a matter within the trial court's jurisdiction.

## IV

### Conclusion

At this time, there has been no organization determination for the Hospitals to appeal through the federal administrative channels. The state-law claims the Hospitals have asserted are within the trial court's jurisdiction, and the court of appeals erred in concluding otherwise. We reverse the court of appeals' judgment and remand to the trial court for further proceedings. TEX.R.APP. P. 60.2(d).