# IN THE SUPREME COURT OF TEXAS

════════════
No. 11-0483
════════════

CHRISTUS HEALTH GULF COAST, ET AL., PETITIONERS,

v.

AETNA, INC. AND AETNA HEALTH, INC., RESPONDENTS

════════════════════════════════════════════════════
ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE FOURTEENTH DISTRICT OF TEXAS
════════════════════════════════════════════════════

**Argued December 5, 2012**

JUSTICE WILLETT delivered the opinion of the Court.

The Texas Prompt Pay Statute entitles physicians and providers to swift payment of undisputed healthcare claims. This case asks whether the duty to pay promptly can be shifted from one company to another. Specifically, can several Houston-area hospitals seek prompt-pay penalties against a health maintenance organization (HMO) for nonpayment of medical services provided to patients under contracts the hospitals had with the HMO's delegated network, rather than with the HMO itself? The plain language of the Prompt Pay Statute forecloses such a suit: Providers must have contractual privity with the HMO directly, not merely with its delegated network. The statute's clear HMO-provider requirement is made clearer still by an amendment to the Prompt Pay Statute, which, while inapplicable here (as it postdates these contracts) gives the Commissioner of Insurance

the discretionary power to order an HMO to pay providers when its delegated network cannot, thus suggesting only regulatory intervention, not private litigation, is available.

In sum, we decline to depart from the words of the statute. The court of appeals correctly held that the providers alleged no recognized prompt-pay violation, and we affirm its judgment.

## I. Facts

Christus Health Gulf Coast, Christus Health Southeast Texas, Gulf Coast Division, Inc., Memorial Hermann Hospital System, and Baptist Hospitals of Southeast Texas (collectively the Hospitals) sued Aetna, Inc. and Aetna Health, Inc. (collectively Aetna) for allegedly violating the Prompt Pay Statute.[1] The parties have previously appeared before the Court,[2] and we briefly summarize the facts.

Aetna and its predecessor provided a Medicare plan entitled "NYLCare 65" through an HMO called NYLCare.[3] It delegated the administration of its NYLCare plan, including claims processing, to North American Medical Management of Texas (NAMM), a third-party administrator.[4] IPA Management Services (Management Services), a physician-owned affiliate of NAMM, was formed to provide the actual "primary care and specialist" medical services to NYLCare enrollees. For any

---

[1] Act of May 29, 1999, 76th Leg., R.S., ch. 1343, § 1, 1999 Tex. Gen. Laws 4556, 4556–57, *repealed by* Act of May 22, 2001, 77th Leg., R.S., ch. 1419, § 1, 2001 Tex. Gen. Laws 3658, 3658, 3793–95 (current version at TEX. INS. CODE § 843.336–.344) (hereinafter "Section 18B").

[2] *See Christus Health Gulf Coast v. Aetna, Inc.*, 237 S.W.3d 338 (Tex. 2007).

[3] *Id.* at 340 & n.5.

[4] *Id.* at 340.

2

other services that its physicians could not provide to NYLCare enrollees, Management Services contracted with other providers.

Management Services separately entered into contracts with the Hospitals to secure hospital services for the NYLCare enrollees. Aetna was not a party to these contracts, and it maintains it did not help negotiate or draft them. The Hospitals addressed the enrollees' hospital bills to "NYLCare" or "NYLCare 65" and submitted them to NAMM for payment. NAMM paid the Hospitals "hundreds of millions of dollars."

Aetna paid Management Services a capitated fee, or a fee per enrollee, for medical care provided to enrollees. Such a fee must be paid regardless of "the type, cost, or frequency of [medical] services furnished."[5] The parties dispute whether the capitated fee also included the contracted services that Management Services arranged for the enrollees on Aetna's behalf when Management Services could not provide the services itself.

NAMM and Management Services had financial difficulties and notified Aetna of their insolvency in early August 2000. Six days later, Aetna de-delegated NAMM and immediately assumed responsibility for processing and paying claims. However, Aetna instructed the Hospitals to continue submitting their bills to NAMM. Aetna refused to pay more than $13 million that the Hospitals had billed to NAMM for services incurred by NYLCare enrollees before Aetna de-delegated NAMM.

---

[5] 42 C.F.R. § 422.350(b) (2006).

The Hospitals argue that, pursuant to the Prompt Pay Statute, Aetna should have paid their claims not more than 45 days after they sent the NYLCare bills to NAMM.

## II. Procedural History

Previously, we held that determining Aetna's responsibility for unpaid hospital bills was within the trial court's jurisdiction.[6] The Hospitals now claim that Aetna was liable under the Prompt Pay Statute for NAMM's failure to timely pay claims. At trial, the Hospitals moved for summary judgment on Aetna's alleged prompt-pay violation. Aetna filed a cross-motion for summary judgment, arguing it was not responsible for the $13 million in outstanding bills because it had already prepaid more than $53 million in capitated fees to Management Services in that year alone. The trial court granted Aetna's cross-motion for summary judgment and denied the Hospitals' motion.

The court of appeals affirmed, concluding "that the plain language of the Prompt Pay Statute requires contractual privity between the HMO and the provider . . . ."[7] That is, because the Hospitals entered into contracts with Management Services and not with Aetna directly, the Hospitals have no viable prompt-pay claim.

---

[6] *Christus Health*, 237 S.W.3d at 339.

[7] 347 S.W.3d 726, 734.

4

## III.  Discussion

This is a pure statutory-construction case: What does the Prompt Pay Statute require?  We review such questions de novo[8] and, as we recently explained, begin (and often end) with the Legislature's chosen language:

> [T]he truest manifestation of what lawmakers intended is what they enacted.  This voted-on language is what constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, "the judge's inquiry is at an end."[9]

We must take the Legislature at its word, respect its policy choices, and resist revising a statute under the guise of interpreting it.[10]

In this case, we agree with the court of appeals that the Prompt Pay Statute contemplates contractual privity between HMOs and providers.  The statute provides:

> (c) Not later than the 45th day after the date that the health maintenance organization receives a clean claim from a physician or provider, the health maintenance organization shall:
> > (1) pay the total amount of the claim in accordance with the contract between the physician or provider and the health maintenance organization;
> > (2) pay the portion of the claim that is not in dispute and notify the physician or provider in writing why the remaining portion of the claim will not be paid; or
> > (3) notify the physician or provider in writing why the claim will not be paid.[11]

---

[8] *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625 (Tex. 2008).

[9] *Combs v. Roark Amusement & Vending, L.P.*, _ S.W.3d _ (Tex. 2013) (footnotes omitted) (quoting *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 651–52 (Tex. 2006)).

[10] *See Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 443 (Tex. 2009).

[11] Section 18B(c).

5

Thus, an HMO is only required to pay within the 45-day deadline "the total amount of the claim *in accordance with the contract between the physician or provider and the health maintenance organization . . . .*"[12] As there were no contracts between Aetna and the Hospitals, Aetna could not have violated the statute.

The prompt-pay penalty likewise shows there must be a direct HMO-provider contract. If an HMO fails to timely pay, it is penalized with the "*contracted* penalty rate" or must pay the "full amount of billed charges."[13]

The Hospitals contend that "the capitation payments Aetna made to Management Services did not cover hospital services" under the contract between Aetna and Management Services. They also argue that Management Services was barred by the Insurance Code from assuming the risk of paying the Hospitals' bills because it would have had to be a health insurance provider to do so. We do not address whether the agreements, drafted and entered into in the 1990s by Aetna's predecessor, require Management Services to pay for hospital services provided to NYLCare enrollees out of the capitation fee paid by Aetna, or whether Aetna agreed to reimburse Management Services additionally for the hospital services. The existence of contractual liability between Aetna and Management Services is immaterial to whether Aetna has statutory liability under the Prompt Pay Statute. Regardless of the terms of Aetna's contract with Management Services, and regardless of whether Management Services could assume the financial risk of paying for hospital services under the Insurance Code, a violation of the Prompt Pay Statute presumes a direct HMO-provider contract

---

[12] Section 18B(c)(1) (emphasis added).

[13] Section 18B(f) (emphasis added).

between Aetna and the Hospitals. Any alleged violation of the Insurance Code or breach of the contract between Aetna and Management Services is a separate legal dispute, and not one governed by the Prompt Pay Statute.

The Hospitals argue that the unambiguous language requiring contractual privity is trumped by the overall structure of the statute. They stress that, under the Delegated Network provisions,[14] Aetna remains responsible for the provision of hospital services. Specifically, the Insurance Code required the delegation agreement between Aetna and Management Services to include:

> a provision that the delegation agreement may not be construed to limit in any way the health maintenance organization's authority or responsibility, including financial responsibility, to comply with all statutory and regulatory requirements . . . .[15]

The key inquiry is simply stated: What duties did Aetna have under the Insurance Code? An agreement between Aetna and Management Services that requires Aetna to abide by "all statutory and regulatory requirements" cannot enlarge Aetna's duties under the Prompt Pay Statute. The Delegated Network provisions detail the arrangement between Aetna and NAMM or Management Services; they do not broaden (or shrink) Aetna's prompt-pay exposure.[16] And the Prompt Pay provisions presume HMO-provider privity. The Legislature's words, and thus the result, are straightforward: Aetna must have directly contracted with the Hospitals to fall under the Prompt Pay Statute.

---

[14] *See* Act of May 18, 1999, 76th Leg., R.S., ch. 621, § 2, 1999 Tex. Gen. Laws 3163, 3164–68, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (hereinafter "Section 18C").

[15] Section 18C(a)(4).

[16] *See* Section 18C.

The Hospitals argue that because Aetna was responsible for and continued to monitor NAMM and Management Services—even deciding to conduct an on-site audit of NAMM to ensure it was running smoothly—Aetna was therefore ultimately responsible for paying hospital bills pursuant to the contracts between Management Services and the Hospitals. Aetna counters by explaining that their monitoring and auditing activity was normal for any principal monitoring an independent-contractor relationship, and that the activity in no way belied a legal responsibility for payment. We agree that monitoring is no justification for eschewing the statute's explicit requirement for HMO-provider privity.

The Hospitals also note that Aetna, while disavowing prompt-pay responsibility due to a lack of contractual privity, continued paying certain providers following NAMM and Management Services' insolvency. Aetna explained these payments resulted merely from a need to ensure "continuity of care" for its members. Regardless of why Aetna continued to pay claims, whether incautiously or intentionally, doing so does not implicate, much less alter, the terms of the Prompt Pay Statue.

Finally, a 2001 amendment to the Prompt Pay Statute,[17] though inapplicable here,[18] is instructive, and underscores Aetna's nonliability for its delegated network's failure to pay the Hospitals. Specifically, the Legislature in 2001 gave the Insurance Commissioner the discretionary

---

[17] Act of May 17, 2001, 77th Leg., R.S., ch. 550, § 4, sec. 18C(g)(1)(1), 2001 Tex. Gen. Laws 1041, 1047, *repealed by* Act of May 22, 2003, 78th Leg., R.S., ch. 1274, § 26(a)(1), 2003 Tex. Gen. Laws 3611, 4138 (current version at TEX. INS. CODE § 1272.208(b)(1)) (hereinafter "2001 Amendment").

[18] The amendment applies only to health insurance contracts "entered into or renewed on or after January 1, 2002." Act of May 17, 2001, 77th Leg., R.S., ch. 550, § 7, 2001 Tex. Gen. Laws 1041, 1050.

authority to compel an HMO to "reassum[e] the functions delegated to the delegated entity, including claims payments for services previously rendered to enrollees of the health maintenance organization . . . ."[19] Tellingly, the 2001 change provides *administrative* relief in situations like this, but it nowhere grants providers a *private* action against HMOs.[20] It authorizes administrative intervention but not private litigation. As the Legislature is presumed to know its previous enactments, we read statutes not in a vacuum but contextually, and the implication of this 2001 amendment is significant: There would be no need for the Legislature to impose such a duty on HMOs (notably, one triggered solely by discretionary administrative action) if the pre-2001 statute already imposed that duty (actionable by private lawsuit).

### IV. Conclusion

The Prompt Payment Statute by its terms decides this case, and it requires HMO-provider contractual privity before the 45-day payment deadline applies. At bottom, this case is not about HMOs not paying providers, but about providers not paying providers—here a physician-owned entity not paying hospitals. The Prompt Pay Statute requires HMOs to honor their own contracts with providers, but here, there are no such contracts. These sophisticated providers opted for a different contractual model, and the resulting lack of privity between the Hospitals and Aetna precludes the Hospitals' suit.

The modern healthcare-insurance and -reimbursement system (like the healthcare-delivery system generally) is dizzyingly complex—the product of innumerable legislative judgments about

---

[19] 2001 Amendment.

[20] *See id.*

9

access, cost, and quality that courts are ill-suited to second-guess. Through the risk-shifting mechanism of capitation, a delegated-network system of managed care gives entrepreneurial providers greater control over their practices, including medical decisionmaking, and greater bargaining leverage with HMOs, but as seen here, it also introduces a host of risks attendant to patient care. Such risk-shifting, including the specter of insolvency, is inherent in the nature of delegation agreements.

Barring a constitutional violation, though, it is the Legislature's prerogative to allocate risk among medical service providers, HMOs, and delegated networks. In 2001, the Legislature rebalanced the equities in situations like this, giving the Insurance Commissioner the discretionary power to direct an HMO to reassume the claims-payment function of a delegated entity. While the Legislature enhanced the Insurance Commissioner's regulatory role over HMOs when their delegated networks don't fulfill their contractual obligations, the Legislature stopped short of giving private medical providers a cause of action against HMOs for their delegated networks' misjudgments or miscalculations. In short, there is recourse today against HMOs whose delegated networks misstep, but it belongs to the Insurance Commissioner, not to providers. We decline to impose judicially a legal or financial obligation that was not imposed legislatively.

We affirm the court of appeals' judgment.

_____

Don R. Willett
Justice

**OPINION DELIVERED:** April 19, 2013

11