Justice Guzman, dissenting.
Dogmatic adherence to language divorced from context can distort the law. This axiom has long guided our interpretation of statutes,[1] and it applies with equal force when we construe precedent. Application of precedent requires us to consider *781 not only the language an opinion employs, but also the animating logic.[2] In this case, which involves the Texas Tort Claims Act's actual-notice exception, the Court's cramped construction of Cathey v. Booth[3] and its progeny thwarts, rather than effectuates, legislative intent. By construing the actual-notice exception to require self-acknowledgment of error, the Court erects an undue impediment to a merits-based disposition that is neither grounded in the statute's language nor consistent with the rationale that informs our precedent.
As we explained in Cathey , "[t]he purpose of the [Tort Claims Act's] notice requirement is to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial."[4] Whether the purpose is satisfied through formal notice or actual notice, the statutory notice requirement strikes a fair balance between providing injured parties a remedy while allowing governmental defendants a fair opportunity to prepare a defense. The Court's analysis skews this balance. Whether the plaintiffs will ultimately prevail on their claims is not the issue here. For purposes of the City of San Antonio's jurisdictional plea, the only issue is whether the record bears some evidence that, even without formal notice of a claim, the City knew enough about its role in the accident to incentivize it to protect its own interests.[5] Because I conclude the record bears such evidence, and the Court holds otherwise, I respectfully dissent.
The Texas Tort Claims Act provides a limited waiver of governmental immunity for certain acts resulting in death, personal injury, or property damage.[6] A damages claim may be prosecuted against the governmental unit if, within six months after the incident occurred, the claimant notifies the defendant of a claim under the Act and the notice "reasonably describe[s]: (1) the damage or injury claimed; (2) the time and place of the incident; and (3) the incident."[7] Formal notice of a claim is not required, however, "if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged."[8]
In Cathey , we held the Act's actual-notice exception is satisfied only when the governmental unit has "knowledge of (1) a death, injury, or property damage; (2) the governmental unit's alleged fault producing or contributing to the death, injury, or property damage; and (3) the identity of the parties involved."[9] The second element of the formal-notice bypass is at issue here-whether the record bears more than a scintilla of evidence that the City of San Antonio had subjective knowledge of its alleged fault producing or contributing to the harm that occurred.
*782 We elaborated on the alleged-fault prong in Texas Department of Criminal Justice v. Simons ,[10] in which we clarified that
[w]hat we intended in Cathey by the second requirement for actual notice was that a governmental unit have knowledge that amounts to the same notice to which it is entitled by [the formal notice requirement in] section 101.101(a). That includes subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury.[11]
Such knowledge obviates the need for formal written notice, because the purpose of the notice statute is merely " 'to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial.' "[12] In rough translation, actual notice is satisfied when the governmental unit has sufficient information to create "the same incentive to gather information" as would arise from formal notice.[13]
The Tort Claims Act's formal-notice requirement apprises governmental units that an individual has "a claim against it" for specific "damage or injury" that occurred during an "incident" at a specific "time and place."[14] When a governmental unit knows that its role in an incident may have caused or contributed to an injury, the "incentive to gather information" arises.[15] Knowledge of alleged fault cannot require, as the Court suggests, the defendant's subjective belief that it is actually at fault.[16] Even with formal notice of a claim, governmental units will no doubt vigorously disclaim responsibility. Acknowledgment of error is neither a statutory requirement nor a fair reading of our case law. In accordance with the spirit, if not the word, of our precedent, the Tort Claims Act's notice requirement is satisfied when the governmental unit has subjective awareness of potential fault "as ultimately alleged by the claimant."[17]
Whether the City of San Antonio had actual notice of potential culpability as alleged in this lawsuit is a fact question.[18] "If the evidence raises a fact question on jurisdiction, the trial court cannot grant [a jurisdictional] plea, and the issue must be resolved by the trier of fact."[19] In reviewing a plea to the jurisdiction, we must "take as true all evidence favorable to the movant,"[20] "indulge every reasonable inference and resolve any doubts in the nonmovant's favor,"[21] and disregard contrary evidence unless a reasonable factfinder could not.[22] Direct evidence of subjective awareness is not required;[23] indeed, when *783 a party's state of mind is at issue, circumstantial evidence is often the only proof available.[24]
This is one such case. At minimum, the jurisdictional evidence raises a fact issue regarding the City's actual knowledge of potential fault as ultimately alleged by the Tenorios. To that end, the City had both the incentive to gather information to mount a defense and the opportunity to do so.
First, in response to the collision, the San Antonio Police Department conducted a crash investigation that went well above and beyond the investigation mandated by its internal policies and, moreover, did so while the facts were fresh and the conditions the same or substantially the same.[25] Although incident reports are required only from pursuing officers, more than thirty officers completed reports following the crash. A third of those additional officers were called to the scene after the crash, solely to assist with traffic control. One report simply narrated, in its entirety: "Assisted redirecting traffic at 410 north and 35, cleared once I was no longer needed due to plenty of officers assisting with traffic." A fact-finder could reasonably infer that such an extensive investigation-well beyond what is required by departmental policies-was sufficient to meet the purpose of the notice provision, allowing the City to fully document the incident in anticipation of potential fault allegations.
Second, on a Texas Department of Transportation "Texas Peace Officer's Crash Report" form, "Fleeing or Evading Police" was identified as the only contributing factor to the crash. Notably, wrong-way driving was not listed as a factor in the crash, even though that was an available option on the form.[26] The allegation in this lawsuit that the police pursuit caused or contributed to the collision is consistent with the crash report's designation of police pursuit as a contributing factor.
Finally, according to a witness statement included in the investigative report, the collision occurred immediately after the police chase terminated at the highway ramp. Temporal proximity between the police officers' actions and the ensuing collision creates a reasonable inference that the City was aware of the police officers' active role in the injury-producing incident, whether they are ultimately determined to be at fault or not.
None of this is an acknowledgment of fault, but it is circumstantial evidence that the City understood the police officers' decision to pursue the fleeing vehicle towards the highway ramp was causally connected to the ensuing wreck, which is precisely what the Tenorios allege in this lawsuit. A fact issue exists concerning the City's "knowledge of ... the governmental unit's alleged fault producing or contributing to the death [or] injury."[27]
*784 The majority likens this case to City of Dallas v. Carbajal ,[28] but the comparison collapses when the facts are carefully analyzed. In Carbajal , the plaintiff was injured when she drove onto an excavated road lacking properly placed barricades.[29] We rejected the plaintiff's argument that the responding police officer's report reflected actual notice of her claim under the Tort Claims Act.[30] The one-page police report in Carbajal was "at most an initial response to the accident,"[31] whereas here, the crash precipitated a thorough police inquiry with over one hundred pages of written statements and reports. The report in Carbajal did not attribute any contributing factors to the governmental defendant.[32] The crash report here, on the other hand, identified evading the police as the accident's sole contributing factor, which necessarily pinpoints two potentially culpable parties: the driver of the vehicle being pursued and the pursuing law enforcement officers. We have repeatedly emphasized that we found no actual notice in Carbajal because " 'a private contractor or another governmental entity (such as the county or state) could have been responsible' " for the placement of barricades that might have prevented the accident.[33] In this case, there are no alternative actors or contributing or producing causes: the police-initiated pursuit was an evident factor in the collision and was expressly identified as a causal contributor; consequently, the City may have had knowledge of its fault "as ultimately alleged by the claimant."[34]
The Court frets that, without a narrow application of our precedent, "actual notice would exist every time a collision with injuries or property damage occurred when a driver was fleeing or evading police, regardless of the other facts."[35] Muniz v. Cameron County , ably distinguished by the court of appeals in this case, refutes that argument.[36] In Muniz , "[t]he Brownsville Police Department investigation only attributed responsibility for the accident to Moreno," who was driving under the influence of cocaine, marijuana, barbiturates, and amphetamines.[37] As Muniz illustrates, a police investigation may well determine that a driver's actions alone caused a crash, regardless of an ongoing chase. In those circumstances, where the chase itself is not an evident factor, no actual notice would be established under the standard we articulated in Cathey and Simons .
In rejecting the City of San Antonio's jurisdictional plea, the lower courts followed our precedent in crediting circumstantial evidence of actual notice, just as other appellate courts have done. In one case, for example, a fact issue existed about actual notice based on evidence that the governmental defendant ordered a contractor to examine a door that fell on the plaintiff and to provide any needed *785 service.[38] Another appellate court similarly found a fact issue regarding actual notice in a slip-and-fall case, citing evidence that the governmental defendant knew a fall occurred in the same location earlier the same day.[39] And in another case, the appellate court determined a fact issue existed based simply on a district official being informed that the plaintiff "tripped over a broken and crumbling area of pavement" that the district controlled.[40]
When we interpreted section 101.101 in Cathey , we effectuated the balance the notice requirement strikes between providing injured plaintiffs a remedy while allowing "governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial."[41] We eschewed a construction of the statute that would tilt the scales to the government's detriment because doing so would "eviscerate the purpose of the statute."[42] Swinging the pendulum too far the other way, as the Court does today, is the same evil packaged differently.
We can give effect to legislative intent without revisiting Cathey , as JUSTICE BOYD suggests,[43] so long as our precedent is applied according to its rationale and reason, which remain sound. Departing from precedent is an extreme option that should be employed sparingly, and the Court need not do so here to conclude the evidence in this case presents a fact issue under Cathey 's framework. The purpose of the notice requirement is to allow adequate, timely investigations.[44] The City of San Antonio Police Department had the incentive and opportunity to conduct a timely and thorough investigation; more notice " 'would do nothing to further the purpose of the statute.' "[45] Rather than settling with the equilibrium that meets the statute's language, today's ruling moves dangerously near a construction of the statute that requires a "confession of fault" for actual notice, an approach the Court has already rejected.[46]
Because an ever narrower construction of the Tort Claims Act's actual-notice exception is discordant with legislative intent plainly expressed in the statute and our precedent construing the statute, I respectfully dissent.
JUSTICE BOYD, joined by JUSTICE LEHRMANN and JUSTICE BLACKLOCK, dissenting.
This case illustrates two realities courts face when applying statutory law. The first is that legislatures sometimes do a very poor job of drafting statutes. The reasons for this are legion-ranging from the practical[1] to the political[2] -but the truth is *786 that legislatures sometimes write statutes that are "odd" and "obtuse,"[3] "difficult to understand and ... apply,"[4] "impossible for the courts to meaningfully construe,"[5] and even "gibberish"[6] that effectively "mean[s] nothing" at all.[7]
Subsection 101.101(c) of the Texas Tort Claims Act, however, is not that kind of statute. It simply, clearly, and unambiguously states that subsection 101.101(a)'s notice-of-claim requirement does "not apply if the governmental unit has actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." TEX. CIV. PRAC. & REM. CODE§ 101.101(c). Under subsection (a), a party who asserts a tort claim against a governmental unit must give the governmental unit formal notice of the claim within six months after the incident giving rise to the claim. Id. § 101.101(a). The notice must reasonably describe the damage or injury claimed, the time and place of the incident, and the incident. Id. But according to subsection (c), subsection (a)'s formal-notice requirement does not apply if the governmental unit has "actual notice" of the death, injury, or property damage on which the claim is based.
Yet subsection (c) perfectly illustrates the second reality courts face when applying statutory law: however bad legislatures can be at writing statutes, courts are typically worse at rewriting them. Courts must resist temptations to rewrite statutes for several reasons. The first is structural: the Texas Constitution forbids it.[8] Our Constitution's separation-of-powers provision demands that judges be "sticklers" when they apply statutes: sticklers about "not rewriting statutes under the guise of interpreting them," about not "supplanting our wisdom for that of the Legislature," and "about a constitutional design that confers [on courts] the power to adjudicate but not *787 to legislate." BankDirect Capital Fin., LLC v. Plasma Fab, LLC , 519 S.W.3d 76, 86 (Tex. 2017). This is not some new Scalian principle. Nearly one hundred years ago, this Court instructed that
Courts must take statutes as they find them. More than that, they should be willing to take them as they find them. They should search out carefully the intendment of a statute, giving full effect to all of its terms. But they must find its intent in its language, and not elsewhere. They are not the law-making body. They are not responsible for omissions in legislation. They are responsible for a true and fair interpretation of the written law. It must be an interpretation which expresses only the will of the makers of the law, not forced nor strained, but simply such as the words of the law in their plain sense fairly sanction and will clearly sustain.
Simmons v. Arnim , 220 S.W. 66, 70 (Tex. 1920).[9]
A second reason courts should avoid rewriting statutes is aspirational: our very freedom depends on it. The Texas Constitution's separation-of-powers provision "reflects a belief on the part of those who drafted and adopted our state constitution that one of the greatest threats to liberty is the accumulation of excessive power in a single branch of government." Armadillo Bail Bonds v. State , 802 S.W.2d 237, 239 (Tex. Crim. App. 1990). It is not hyperbole to say that a court's well-intended effort to "help" the Legislature or "do justice" by rewriting a statute in a given case threatens the very foundation on which our liberty rests. A little tweak here or a little addition there may seem harmless enough at the time, but each little chip in the wall that separates the branches weakens the fortress safeguarding our freedom. As Montesquieu explained centuries ago,
there is no liberty if the powers of judging be not separated from the legislative and executive powers. Were it joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control; for the judge would be the legislator. Were it joined to the executive power, the judge might behave with all the violence of the oppressor.
C. MONTESQUIEU, THE SPIRIT OF LAWS202 (T. Nugent trans., D. Carrithers ed. 1977) (T. Nugent trans. 1st ed. 1750).
A third reason courts should not rewrite legislation is practical: we're typically not very good at it. Usually, at least, the policy-making process of drafting legislation involves "the kind of line-drawing" courts are simply not "equipped to do." Patel v. Tex. Dep't of Licensing & Regulation , 469 S.W.3d 69, 137 (Tex. 2015) (HECHT, C.J., dissenting). While courts may "make law" by developing precedential common law on a case-by-case basis,[10] the judicial branch is neither designed nor constructed to engage *788 in the drafting or redrafting of statutes. We cannot create committees and hold public hearings to solicit input from those who may be affected; we cannot tally the votes of officials elected to represent the varied interests of citizens in different communities around the state; we can't even request the Legislative Council's assistance in the drafting process. In short, our "institutional competence" for writing legislation is as limited as our "constitutional mandate." Ayotte v. Planned Parenthood of N. New England , 546 U.S. 320, 329 (2006).
As a result, courts usually do a very poor job of rewriting statutes. Take, for example, Cathey v. Booth , 900 S.W.2d 339 (Tex. 1995) (per curiam). The petitioners in Cathey argued that subsection 101.101(a)'s formal-notice requirement did not apply in that case because the governmental unit had actual notice "that a death, an injury, or property damage has occurred." Id. at 341. In other words, they argued that subsection 101.101(c) means exactly what it says. The Court rejected that argument, however, and held instead that subsection (c) requires "actual notice" not only of the death, injury, or property damage, but also of "the governmental unit's alleged fault producing or contributing to the death, injury, or property damage, ... and the identity of the parties involved." Id. So under Cathey , subsection (a)'s formal-notice requirement applies even if the governmental unit has actual notice of the death, injury, or property damage, unless it also has actual notice of its "alleged fault producing or contributing to" that loss. Id. Yet subsection (c) contains no language that could reasonably be construed as requiring the governmental unit to have actual notice of its "alleged fault" in producing or contributing to the loss.
Why would the Court-in a per curiam opinion, no less-rewrite the statute in that manner? The Court's answer to that question is not very satisfying, at least to those who believe courts "must take the Legislature at its word, respect its policy choices, and resist revising a statute under the guise of interpreting it." Christus Health Gulf Coast v. Aetna, Inc. , 397 S.W.3d 651, 654 (Tex. 2013). According to the Cathey Court, interpreting subsection (c) to mean what it clearly says "would eviscerate the purpose of the statute," which-again, according to the Cathey Court-is "to ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." Cathey , 900 S.W.2d at 341. Subsection (c) as written, the Court explained, cannot fulfill this presumed purpose because it "would impute actual notice to a hospital from the knowledge that a patient received treatment at its facility or died after receiving treatment," and that "would be the equivalent of having no notice requirement at all because the hospital would be required to investigate the standard of care provided to each and every patient that received treatment." Id. To promote the statute's presumed "purpose," the Court simply rewrote subsection (c). See ids="10008337" index="63" url="https://cite.case.law/sw2d/900/339/#p341">id.
But it did a very poor job of rewriting it. The Court itself has acknowledged that the courts of appeals have remained confused about what the Cathey test actually means.[11] And the Court has revised the test twice to more effectively promote the purpose it identified in Cathey . Twenty- three years after Cathey , today's case represents just one more exertion in the Court's ongoing effort to figure out what it believes the law should require. While that may be a natural process when the Court *789 is developing the common law, we are dealing here with a statute that already tells us what the law does require. Subsection (c) does not impose the requirements the Cathey Court imposed, and it does not express the purpose on which the Cathey Court relied to impose those requirements.
The evidence in this case conclusively establishes that the City of San Antonio had actual notice of the death, injuries, and property damage on which Roxana Tenorio's claims are based. Yet without even granting oral argument, the Court reverses the court of appeals and the trial court and dismisses Tenorio's claims for lack of jurisdiction, relying not on subsection (c)'s language but on Cathey and its progeny. With all due respect for the principle of stare decisis, I believe it's time the Court reconsider those decisions. Although Tenorio has not had an opportunity to present this argument, I would at least invite the parties to submit additional briefing on that issue and schedule this case for oral argument. Because the Court instead summarily dismisses Tenorio's claims, I respectfully dissent.
A. Cathey was wrong.
Undeniably, the Cathey Court rewrote subsection (c) to add requirements the statute does not impose-most notably, the requirement that the governmental unit have actual notice of its "alleged fault producing or contributing to the death, injury, or property damage." Cathey , 900 S.W.2d at 341. And no doubt, the Court's addition of that requirement substantially altered the subsection's meaning and effect. Under subsection (c), a claimant need not give the government formal notice under subsection (a) if the government has actual notice of the death, injury, or damage. TEX. CIV. PRAC. & REM. CODE§ 101.101(c). But under Cathey , the same claimant in the same case cannot pursue the claim at all-in fact, courts have no jurisdiction to even hear the claim-unless the government also has actual notice of its "alleged fault." See Univ. of Tex. Sw. Med. Ctr. at Dall. v. Estate of Arancibia , 324 S.W.3d 544, 547 (Tex. 2010) (explaining that the Legislature has made section 101.101 's notice requirement jurisdictional, "meaning that the trial court could dispose of the case on a plea to the jurisdiction").
Judicially rewriting a statute as the Court did in Cathey violates the well-established and oft-repeated principles that, according to the Court itself, govern statutory construction:
• To determine a statute's meaning, we begin with the statute's language. In re Office of Atty. Gen. , 422 S.W.3d 623, 629 (Tex. 2013) ("Legislative intent is best revealed in legislative language.").
• When the statute's language is unambiguous and does not lead to absurd results, our search ends with the statute's language. Id .; see Christus Health Gulf Coast , 397 S.W.3d at 653 (We "begin (and often end) with the Legislature's chosen language."); Entergy , 282 S.W.3d at 437 ("Where text is clear, text is determinative.").
• The Legislature's "voted-on language is what constitutes the law, and when a statute's words are unambiguous and yield but one interpretation, 'the judge's inquiry is at an end.' " Combs v. Roark Amusement & Vending, L.P. , 422 S.W.3d 632, 635 (Tex. 2013) (quoting Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson , 209 S.W.3d 644, 651-52 (Tex. 2006) ).
• "Enforcing the law as written is a court's safest refuge in matters of statutory construction, and we should always refrain from rewriting text that lawmakers chose." Entergy , 282 S.W.3d at 443.
*790 • "[W]e do not pick and choose among policy options on which the Legislature has spoken." F.F.P. Operating Partners, L.P. v. Duenez , 237 S.W.3d 680, 690 (Tex. 2007).
• "[I]t is not for courts to undertake to make laws 'better' by reading language into them, absent the necessity to do so to effect clear legislative intent or avoid an absurd or nonsensical result that the Legislature could not have intended." CadenaComercial USA Corp. v. Tex. Alcoholic Beverage Comm'n , 518 S.W.3d 318, 338 (Tex. 2017).
• "Only truly extraordinary circumstances showing unmistakable legislative intent should divert us from enforcing the statute as written." Fitzgerald v. Advanced Spine Fixation Sys., Inc. , 996 S.W.2d 864, 867 (Tex. 1999).
The Court ignored these principles in Cathey because it believed subsection (c) as written is inadequate to achieve what it assumed to be the statute's purpose: to "ensure prompt reporting of claims in order to enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial." Cathey , 900 S.W.2d at 341. To support its articulation of the statute's purpose, the Court cited not to the statute's language but to its earlier decision in City of Houston v. Torres , 621 S.W.2d 588, 591 (Tex. 1981), which in turn cited two previous decisions, Artco-Bell Corp. v. City of Temple , 603 S.W.2d 385 (Tex. Civ. App.-Austin 1980) , rev'd on other grounds , 616 S.W.2d 190 (Tex. 1981), and City of Waco v. Landingham , 158 S.W.2d 79 (Tex. Civ. App.-Waco 1940, writ ref'd). See Cathey , 900 S.W.2d at 341.
Neither Torres , Artco-Bell , nor Landingham provide support for the Court's conclusion regarding the statute's purpose. None of those cases involved section 101.101 or the Tort Claims Act at all; instead, all three cases involved notice-of-claim requirements contained in a municipal ordinance. See Torres , 621 S.W.2d at 591 ; Artco-Bell , 616 S.W.2d at 193 ; Landingham , 158 S.W.2d at 79. Each of the municipal ordinances contained formal-notice requirements like those described in subsection 101.101(a), but none of them included an actual-notice exception like subsection (c).[12] Even if the Cathey Court accurately described the purpose of a formal-notice provision, section 101.101 's inclusion of an actual-notice exception must necessarily alter that "purpose" to have any meaning at all. As the Court has explained, the "purposes" of notice-of-claim provisions contained in "various" statutes and ordinances "vary, as do the consequences for noncompliance." Hines v. Hash , 843 S.W.2d 464, 468 n.4 (Tex. 1992) (citing section 101.101, among others). Yet the Cathey Court never considered how subsection (c)'s actual-notice exception might reflect a "purpose" that differs from notice provisions that contain no such exception.
*791 Even assuming subsection (c)'s purpose were identical to a municipal ordinance's formal-notice requirement (that is, to "enable governmental units to gather information necessary to guard against unfounded claims, settle claims, and prepare for trial," Cathey , 900 S.W.2d at 341 ), a court has no authority to alter subsection (c)'s plain language just because it believes some different statutory requirement would accomplish that purpose more effectively. Subsection (c)'s requirement is unambiguous, and courts must "read unambiguous statutes as they are written, not as they make the most policy sense." Combs v. Health Care Serv. Corp. , 401 S.W.3d 623, 629 (Tex. 2013). "[E]xcept in the rare case of an obvious scrivener's error, purpose-even purpose as most narrowly defined-cannot be used to contradict text or to supplement it ." ANTONIN SCALIAand BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS57 (2012) [hereafter READING LAW] (emphasis added).
Section 101.101 does not contain any explicit "purpose." According to its plain and unambiguous language, its only purpose is to require formal notice of a tort claim against a governmental unit unless the governmental unit has actual notice of the death, injury, or property damage on which that claim is based. TEX. CIV. PRAC. & REM. CODE§ 101.101(a), (c). Maybe the Legislature intended to ensure that governmental units are able to "gather information necessary to guard against unfounded claims, settle claims, and prepare for trial," but mistakenly enacted an inadequate means to achieve that purpose. Cathey , 900 S.W.2d at 341. Or maybe it believed a governmental unit that has actual notice of the death, injury, or damage has enough information to enable it to take the steps necessary to "guard against unfounded claims, settle claims, and prepare for trial. " Id. Perhaps, like the Austin Court of Appeals has suggested,[13] the Legislature that drafted and enacted subsection (c) believed its actual-notice requirement was sufficient to achieve its legislative purpose.
Whatever section 101.101 's unexpressed "purpose" might be, "no legislation pursues its purposes at all costs. Deciding what competing values will or will not be sacrificed to the achievement of a particular objective is the very essence of legislative choice." Rodriguez v. United States , 480 U.S. 522, 525-26 (1987). "Or to put the point differently, the limitations of a text-what a text chooses not to do-are as much a part of its 'purpose' as its affirmative dispositions." READING LAWat 57. Requiring the governmental unit to have actual notice of the death, injury, or damage, in other words, is part of subsection (c)'s purpose; but not requiring the governmental unit to have actual notice of its "alleged fault producing or contributing to the death, injury, or property damage" is also a part of its purpose. The Legislature's omissions of such requirements "must be respected, and the only way to accord them their due is to reject the *792 replacement or supplementation of text with purpose." Id. at 57-58.
Of course, we may reject a statute's unambiguous language if its plain meaning would lead to "absurd results." Combs , 401 S.W.3d at 629. Perhaps that is what the Cathey Court was thinking when it concluded that applying subsection (c) as written "would be the equivalent of having no notice requirement at all because the hospital would be required to investigate the standard of care provided to each and every patient that received treatment." Cathey , 900 S.W.2d at 341. But even if requiring every government hospital to "investigate the standard of care provided to each and every patient that received treatment" were an absurd result, subsection (c) does not require that result. Not "every patient that receive[s] treatment" at a government hospital suffers death, injury, or damage. A governmental hospital would be wise to investigate whenever a patient suffers a death, injury, or damage, but subsection (c) does not require the hospital to investigate every time a patient "receives treatment."
Even if subsection (c)'s requirement seems odd, unduly burdensome, unwise, or bad policy, the Legislature-not the Court-has the power to change it. "We have no right to engraft upon the statute any conditions or provisions not placed there by the legislature." Duncan, Wyatt & Co. v. Taylor , 63 Tex. 645, 649 (1885) (quoted in Iliff v. Iliff , 339 S.W.3d 74, 80-81 (Tex. 2011) ). Ultimately, courts "are bound, not only by the ultimate purposes [the Legislature] has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes." MCI Telecomm. Corp. v. Am. Tel. & Tel. Co. , 512 U.S. 218, 231 n.4 (1994). Even if Cathey 's requirement that the governmental unit have actual notice of its "alleged fault" might further the statute's purpose, "it frustrates rather than effectuates legislative intent simplistically to assume that whatever furthers the statute's primary objective must be the law." Rodriguez , 480 U.S. at 526. Whatever section 101.101 's purpose might be, it achieves that purpose by requiring formal notice of a claim unless the governmental body has actual notice of the death, injury, or damage. Neither the statute's language nor its unexpressed purpose justified the Cathey Court's decision to rewrite subsection (c)'s plain and unambiguous language.
B. The Court should reconsider Cathey and its progeny.
Although I find it easy to conclude that Cathey was wrongly decided, deciding whether to overrule it presents a much more difficult question. This Court's prior decisions "are unquestionably entitled to most respectful consideration, and should not be lightly disregarded or overruled." P.J. Willis & Bro. v. Owen , 43 Tex. 41, 49 (1875). "Generally, the doctrine of stare decisis dictates that once the Supreme Court announces a proposition of law, the decision is considered binding precedent ...." Sw. Bell Tel. Co., L.P. v. Mitchell , 276 S.W.3d 443, 447 (Tex. 2008) (quoting Lubbock Cty. v. Trammel's Lubbock Bail Bonds , 80 S.W.3d 580, 585 (Tex. 2002) ). Stare decisis is a sound policy because it promotes certainty and finality. These in turn promote efficiency by preventing the re-litigation of issues courts have already decided. Weiner v. Wasson , 900 S.W.2d 316, 320 (Tex. 1995). It also promotes fairness by honoring the "settled expectations of litigants ... who have justifiably relied on the principles articulated" in those prior decisions. Id. And it promotes the "legitimacy of the judiciary" by providing "a stable and predictable decisionmaking process." Id. Certainly, a court's decisions "should not change merely because the judges have changed."
*793 Mitchell , 276 S.W.3d at 448. And the doctrine of stare decisis "has its greatest force" in the area of statutory construction. Marmon v. Mustang Aviation, Inc. , 430 S.W.2d 182, 186 (Tex. 1968).
But stare decisis only "creates a strong presumption in favor of the established law; it does not render that law immutable." Gutierrez v. Collins , 583 S.W.2d 312, 317 (Tex. 1979). We "have long recognized that the doctrine is not absolute," Mitchell , 276 S.W.3d at 447, and "circumstances occasionally dictate reevaluating and modifying prior decisions," Trammel's Lubbock Bail Bonds , 80 S.W.3d at 585. In other words, stare decisis "prevents change for the sake of change; it does not prevent any change at all." Gutierrez , 583 S.W.2d at 317.
The mere fact that the Court previously rendered an incorrect decision does not grant us "liberty to perpetuate [the] error." Mitchell , 276 S.W.3d at 447. If a prior decision is wrong, our duty to uphold the law compels us to correct the decision unless it has provided the governing rule for "so long," and citizens have relied on it so extensively, that "greater injustice would be done to individuals, and more injury result to society by a reversal of such decision, though erroneous, than to follow and observe it." P.J. Willis , 43 Tex. at 48. But when "adherence to a judicially-created rule of law no longer furthers" the interests of efficiency, fairness, and legitimacy, "and 'the general interest will suffer less by such departure, than from a strict adherence,' we should not hesitate to depart from a prior holding." Lehmann v. Har-Con Corp. , 39 S.W.3d 191, 215 (Tex. 2001) (quoting Benavides v. Garcia , 290 S.W. 739, 740 (Tex. Comm'n App. 1927, judgm't adopted), and citing Weiner , 900 S.W.2d at 320 ). I believe several factors justify the Court's reconsideration of Cathey and its progeny.
1. Obvious error
First, we should reconsider Cathey because it was so obviously wrong. Certainly, one concern when deciding whether to overrule precedent is whether that decision "is contrary to plain principles of law." GARNER ET AL., THE LAW OF JUDICIAL PRECEDENT396 (2016) [hereafter JUDICIAL PRECEDENT]. This Court has not hesitated to overrule precedent when its prior holding "was contrary to the plain words of the statute," Crawford v. Coleman , 726 S.W.2d 9, 10-11 (Tex. 1987), and thus "simply incorrect," Tooke v. City of Mexia , 197 S.W.3d 325, 342 (Tex. 2006) ; see Trammel's Lubbock Bail Bonds , 80 S.W.3d at 585 (overruling prior opinion because it was "inconsistent with Texas law governing statutes of limitations"); P.J. Willis , 43 Tex. at 49 (overruling prior decisions because "the judgments are erroneous"). The fact that Cathey so clearly rewrote subsection (c) based solely on its erroneous reliance on a presumed but unexpressed "purpose" weighs in favor of overruling the decision.
2. Jurisprudential importance
Second, the jurisprudential impact of the Cathey Court's error is substantial because subsection (c) addresses whether, when, and how the people of Texas, acting through their elected representatives, have chosen to waive the State's sovereign immunity. Subsection (c) implicates financial, jurisdictional, and constitutional issues that are fundamental to our governmental structure and operations. Because the "roots" of sovereign immunity "remain secure within the sovereign," we "generally defer to the sovereign will of the state -as expressed by 'the people'-for any waiver of already existing immunity." Wasson Interests, Ltd. v. City of Jacksonville , 489 S.W.3d 427, 432 (Tex. 2016). We have thus "uniformly held that it is the Legislature's sole province"-not that of the courts-to *794 waive sovereign immunity. Fed. Sign v. Tex. S. Univ. , 951 S.W.2d 401, 409 (Tex. 1997). We defer to the Legislature to waive immunity because doing so "allows the Legislature to protect its policymaking function." Wasson , 489 S.W.3d at 433 (internal quotations omitted). If the Legislature makes the policy choice to statutorily waive immunity using "clear and unambiguous language," courts must honor that decision. Sampson v. Univ. of Tex. at Austin , 500 S.W.3d 380, 384 (Tex. 2016) (quoting TEX. GOV'T CODE§ 311.034 ).
In the Tort Claims Act, the Legislature has provided a "unique statutory scheme" through which it has waived the State's sovereign immunity for certain tort claims, but only if the governmental unit receives the notice section 101.101 requires. Id. In subsection (c), the Legislature uses "clear and unambiguous" language to waive immunity even if the governmental unit does not receive the formal notice subsection (a) requires, but only if the governmental unit has actual notice of the death, injury, or damage. By defining the requirements of this waiver, the Legislature has fulfilled its constitutional duty to determine both whether and how to protect the public fisc and whether the judicial branch has jurisdiction to even consider the claim. By judicially rewriting subsection (c), the Cathey Court commandeered the Legislature's authority to decide whether and when to waive sovereign immunity-an authority we have repeatedly asserted belongs solely to the Legislature. As a result, under Cathey , sovereign immunity is not waived in cases in which the Legislature has declared it is waived.
In short, the Cathey Court did not simply decide whether the Booths could sue a county hospital or whether Tenorio can sue the City of San Antonio. Instead, by rewriting the language the Legislature enacted in subsection (c), the Cathey Court altered the bases on which a claimant may sue a governmental unit, transformed the judiciary's jurisdiction to hear such claims, and usurped the Legislature's authority to decide whether and when to waive sovereign immunity. I believe we should reconsider Cathey because it erred on questions addressing "the structure of the government" and "the limitations upon legislative and executive power." P.J. Willis , 43 Tex. at 49. "Certainly, it cannot be seriously insisted, that [such] questions ... can be disposed of by the doctrine of stare decisis." Id .
3. Confusion and uncertainty
Third, I believe the Court should reconsider Cathey because, as the Court's opinions in today's case illustrates, Cathey and its progeny have done little to promote efficiency, fairness, predictability, and legitimacy. Instead, they have caused confusion and uncertainty about a statute that is perfectly clear.
The Cathey Court held that subsection (a)'s formal-notice requirement applies unless the governmental unit has actual notice not only of the death, injury, or damage, but also of the "governmental unit's alleged fault producing or contributing to the death, injury, or property damage." Cathey , 900 S.W.2d at 341. When the Court next addressed the issue nine years later, however, it acknowledged that Cathey had created confusion in the courts of appeals, which had "interpreted Cathey's requirement ... to mean very different things." Tex. Dep't of Crim. Justice v. Simons , 140 S.W.3d 338, 344 (Tex. 2004). Some had held that a governmental unit has actual notice under subsection (c) if it has "the same information it would have had if the claimant had complied with the *795 formal notice requirements."[14] Others had adopted "a broader view that the occurrence of an event may itself provide actual notice if fault is obvious or an investigation is triggered."[15] Some had concluded "that such an incident must be disruptive enough to call the governmental unit's attention to its fault,"[16] while still others adopted the "broadest view" that "an incident itself gives actual notice if it should trigger an investigation that would or could show the governmental unit at fault."[17]
The Court held in Simons that Cathey 's reference to "actual notice" of "alleged fault" did not "mean that the governmental unit was required to know that the claimant had actually made an allegation of fault." Id. at 347. Instead, what the Court actually "intended in Cathey " was that the governmental unit must have a "subjective awareness of its fault, as ultimately alleged by the claimant, in producing or contributing to the claimed injury ... along with the other information to which it is entitled under section 101.101(a)." Id. Relying again on the statute's presumed purpose, the Court concluded in Simons that subsection (c) requires that the governmental unit have "subjective awareness of its fault" because, without such awareness, "it does not have the same incentive to gather information that the statute is designed to provide, even when it would not be unreasonable to believe that the governmental unit was at fault." Id. at 348. Thus, the Court explained, "a governmental unit cannot acquire actual notice merely by conducting an investigation, or even by obtaining information that would reasonably suggest its culpability."Id. Instead, it must be subjectively aware "of its fault" in causing the death, injury, or damages.[18] In other *796 words, it must have a subjective awareness "that it was at fault." Loutzenhiser , 140 S.W.3d at 358.
In light of the Simons Court's references to a governmental unit's "subjective awareness" of its "fault" and "culpability," one might reasonably have concluded after Simons that it is "not enough" under subsection (c) "that the governmental unit thinks it may be at fault, or even thinks it is probably at fault; it must actually be aware that it is at fault." Jeffrey S. Boyd, An Ace in the Hole & A Jack of All Trades: Recent Developments Affecting Sovereign Immunity & Pleas to the Jurisdiction , 6 TEX. TECH ADMIN.L.J. 59, 73 (2005). Thus "actual notice exists only if the governmental unit has, at least internally, conceded that it is liable to the plaintiff." Id. "Presumably then, the only cases in which actual knowledge will exist are those in which the battle is over the amount of damages, with liability having been conceded." Id. The Court seemed to confirm this view when it addressed the issue again a few years later, holding that a police officer's accident report on a "routine safety investigation" that did "not indicate that the governmental unit was at fault" was insufficient to establish that the police department had subjective awareness of its fault in causing the accident. City of Dallas v. Carbajal , 324 S.W.3d 537, 539 (Tex. 2010) (per curiam). According to the Court in Carbajal , the investigative report did not provide actual notice under subsection (c) because it gave the governmental unit "little, if any, incentive to investigate its potential liability because it [was] unaware that liability [was] even at issue." Id. (emphases added).
The Court later rejected that understanding of Simons , however, when it addressed the issue yet again in Arancibia , 324 S.W.3d at 544. As in Simons , the Court acknowledged in Arancibia that the Cathey Court's "alleged fault" requirement had "led to some confusion among our courts of appeals." Id. at 548. Although the Simons Court required "subjective awareness of fault " so that the governmental unit would know that "liability is ... at issue" and thus have an "incentive to investigate its potential liability ," Carbajal , 324 S.W.3d at 539 (emphases added), the Court held in Arancibia that the term "fault," at least "as it pertains to actual notice [under subsection (c) ], is not synonymous with liability ; rather, it implies responsibility for the injury claimed." Id. at 550 (emphases added). Thus, a hospital that determined that its "technical error" and "clinical management" had "contributed" to a patient's death and that the care it provided the patient "was not necessarily consistent with established standards" had subjective awareness "of its fault," even though it also concluded internally that none of its actions violated the legal standard of care. Id. at 549-50.[19]
*797 Thus, the Cathey test, as revised in Simons , clarified in Blevins , Loutzenhiser , Johnson , and Carbajal , and then further revised in Arancibia , appears to be this: A governmental unit has "actual notice" under subsection (c)-and thus the claimant need not provide formal notice under subsection (a)-if (1) it is actually, subjectively aware that it took some erroneous action as ultimately alleged by the claimant, and that the action was responsible for producing or contributing to the death, injury, or property damage; and (2) it has actual knowledge of the information it is entitled to be given under subsection (a). The governmental unit need not have actual knowledge that the claimant has actually made an allegation of fault, Simons , 140 S.W.3d at 346, or be subjectively aware that it is legally liable for the harm, Arancibia , 324 S.W.3d at 350 ("Fault, as it pertains to actual notice, is not synonymous with liability."). But actual notice does not exist based merely on evidence that the governmental unit:
• "could or even should have learned of its possible fault by investigating the incident," Simons , 140 S.W.3d at 347 ;
• "did investigate, perhaps as part of routine safety procedures," ids="9212456" index="131" url="https://cite.case.law/sw3d/140/338/#p347">id. ;
• "should have known from the investigation it conducted that it might have been at fault," ids="9212456" index="132" url="https://cite.case.law/sw3d/140/338/#p347">id. at 347-48;
• had knowledge establishing that "it would not be unreasonable to believe that [it] was at fault," ids="9212456" index="133" url="https://cite.case.law/sw3d/140/338/#p347">id. at 348;
• was actually aware of "information that would reasonably suggest its culpability," ids="9212456" index="134" url="https://cite.case.law/sw3d/140/338/#p347">id. ;
• had actual knowledge "of the accident and the presence of its employees at the scene," Blevins , 140 S.W.3d at 337 ;
• had actual knowledge of "facts and circumstances surrounding an accident sufficient to put them on inquiry that, if pursued, would reveal its alleged or possible fault producing or contributing to the injury," Johnson , 140 S.W.3d at 351 ;
• had actual knowledge of facts from which "a prudent entity could ascertain its potential liability stemming from an incident, either by conducting a further investigation or because of its obvious role in contributing to the incident," ids="9212456" index="137" url="https://cite.case.law/sw3d/140/338/#p347">id. ;
• "merely investigat[ed] an accident," Carbajal , 324 S.W.3d at 537 ;
• conducted "a routine safety investigation," id. at 539 ; or
• prepared a report that did "not indicate that the governmental unit was at fault," id.
Today, the Court again disagrees over how to apply this test. The majority holds that the City of San Antonio did not have actual notice under subsection (c) because the record contains no evidence that the City "subjectively believed its officers acted in error by initiating or continuing the pursuit such that they were in some manner responsible for the injuries." Ante at 778. JUSTICE GUZMANwould hold that evidence that (1) the police department "conducted a crash investigation that went well above and beyond the investigation mandated by its internal policies," (2) the investigation report listed "Fleeing or Evading Police" as "the only contributing factor to the crash," and (3) "the collision occurred immediately after the police chase terminated at the highway ramp" at least creates a fact issue as to whether the City had "actual knowledge of potential fault as ultimately alleged by the Tenorios."
*798 Ante at 783, 783, 783 (GUZMAN, J., dissenting).
Both of today's writings make good points, but the real issue is why we (and the lower courts and the parties in these types of cases) must engage in such hair-splitting just to determine whether a governmental unit had "actual notice that death has occurred, that the claimant has received some injury, or that the claimant's property has been damaged." TEX. CIV. PRAC. & REM. CODE§ 101.101(c). It is both uncontested and undeniable that the City of San Antonio had such actual notice in this case, yet we are doomed to continually explain and apply, and clarify and apply, and further clarify and apply, the Cathey test-all to implement an assumed "purpose" the Legislature has never expressly stated. Perhaps the Legislature decided to require only actual notice of the death, injury, or damage because it wanted governmental units (and the claimants who sue them) to avoid having to go through decades of litigation to decide what "actual notice" really means.
Our decisions in Cathey and its progeny, including today's decision, simply confirm that courts are not very good at rewriting statutes. While today's decision may move the law an inch or two nearer to some point of certainty and predictability, confusion will necessarily remain,[20] and I am confident today's decision will not end this journey.[21] In fact, I doubt the journey will ever end, because-as the Court acknowledged in Simons -the " 'actual notice' exception in subsection (c), as we read it , makes determining compliance with section 101.101 somewhat less certain" and presents "a fact question" that in some cases "must be proved, if at all, by circumstantial evidence." Simons , 140 S.W.3d at 348 (emphasis added).
"Stare decisis considerations carry little weight when an erroneous 'governing decisio[n]' has created an 'unworkable' legal regime." Fed. Election Comm'n v. Wis. Right To Life, Inc. , 551 U.S. 449, 501 (2007) (quoting Payne v. Tennessee , 501 U.S. 808, 827 (1991) ); see Grapevine Excavation, Inc. v. Md. Lloyds , 35 S.W.3d 1, 10 (Tex. 2000) (Phillips, C.J., dissenting) (concluding he would reject the Court's precedent and "interpret the law as a matter of first impression" because "two decades of *799 judicial commentary on this statute has left its meaning still unsettled"). Our decisions in Cathey and its progeny find no support in section 101.101 and are instead "sustained only by ... estimations of what [the Legislature] must (despite what it enacted) have intended." United States v. Johnson , 481 U.S. 681, 695 (1987) (Scalia, J., dissenting). I believe we should reconsider Cathey and its progeny to fulfill our duty to honor the Legislature's enactments and promote efficiency, fairness, predictability, and legitimacy.
4. Absence of harm
A fourth reason we should consider overruling Cathey and its progeny is that doing so will not cause any harm or detriment to these parties or to parties in other pending or future cases. Stare decisis applies "with particular force" when the precedent at issue governs land titles, contracts, insurance policies, or common-law rules "upon which parties have probably relied in conducting their personal, family, and business affairs." Marmon , 430 S.W.2d at 193 n.3. But Cathey did not establish that kind of rule. At worst, overruling Cathey would result in governmental units having to defend against tort claims based on deaths, injury, and property damage of which they had actual notice even if they believe they were not responsible for causing those losses. It is difficult to imagine any circumstance in which any claimant or governmental unit could have "conducted its affairs" in such a way that its reliance on Cathey would cause undue harm. The only "harm" in overruling Cathey is that governmental units will not have immunity in cases in which the Legislature has unambiguously waived their immunity.
5. "Legislative acceptance"
Fifth, I must consider the fact that, although more than twenty years have now passed, the Legislature has not amended subsection (c) to express disagreement with the Cathey Court's construction. Applying the fiction of legislative acceptance (or ratification or inaction), we have said that, if "an ambiguous statute that has been interpreted by a court of last resort ... is re-enacted without substantial change, the Legislature is presumed to have been familiar with that interpretation and to have adopted it." Tex. Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc. , 145 S.W.3d 170, 176 (Tex. 2004). In other words, the Legislature "must be regarded as intending statutes, when repeatedly re-enacted, ... to be given that interpretation which has been settled by the courts." Marmon , 430 S.W.2d at 187 (quoting Love v. Wilcox , 28 S.W.2d 515, 524 (Tex. 1930) ). In addition, the doctrine of stare decisis "has its greatest force" in the area of statutory construction because "the Legislature can rectify a court's mistake, and if the Legislature does not do so, there is little reason for the court to reconsider whether its decision was correct." Mitchell , 276 S.W.3d at 447.[22]
But this rule "is not invariable," Marmon , 430 S.W.2d at 187, and "legislative 'inaction' isn't dispositive," JUDICIAL PRECEDENTat 410.[23] For several reasons, *800 I am not convinced the legislative-acceptance fiction should prevent us from considering whether to overrule Cathey . First, the legislative-acceptance fiction does not apply here because no Legislature has ever amended or re-enacted section 101.101. The fiction applies only when a statute "is re-enacted without substantial change" after it has been judicially or administratively construed. Mega Child Care, Inc. , 145 S.W.3d at 176 ; Fleming Foods of Tex., Inc. v. Rylander , 6 S.W.3d 278, 282 (Tex. 1999) (explaining that, under the legislative-acceptance fiction, " 'a statute of doubtful meaning that has been construed by the proper administrative officers, when re-enacted without any substantial change in verbiage, will ordinarily receive the same construction' ") (quoting Sharp v. House of Lloyd, Inc. , 815 S.W.2d 245, 248 (Tex. 1991) ); Marmon , 430 S.W.2d at 187 (stating the fiction applies when statutes are "repeatedly re-enacted"). Although the Legislature has amended other provisions of the Tort Claims Act since the 69th Legislature enacted it in 1985, no subsequent Legislature has ever amended or re-enacted section 101.101.
Second, the legislative-acceptance fiction does not apply here because-as explained above and as today's decision further illustrates-the Court's efforts to write additional requirements into subsection (c) have continuously failed to express a clear and understandable rule. As then-Chief Justice Phillips explained in Grapevine Excavation , there appears to be "no basis to conclude that the ... Legislature has acquiesced in any holding" because this Court's "pronouncements have been inconsistent and confusing" and other courts, "seeking to follow our law, ha[ve] clearly been puzzled." 35 S.W.3d at 6 (Phillips, C.J., dissenting). Because the Legislature has not subsequently amended section 101.101, the legislative-acceptance fiction does not prevent us from overruling our precedent. Crawford , 726 S.W.2d at 11. "Instead, by following the language the legislature employed, the inquiry begins, proceeds, and ends" with the statute's unambiguous language. Id.
Third, the legislative-acceptance fiction simply does not apply "when courts are presented with an unambiguous statute." Iliff , 339 S.W.3d at 80 n.3 ; see Fleming Foods , 6 S.W.3d at 282. Even if we could infer the intent of subsequent Legislatures from their failure to act, any such inference could never justify supplanting the intent of the Legislature that enacted the clear and unambiguous language of section 101.101(c). The legislative-acceptance fiction may apply to "a statute of doubtful meaning," but when the statute is unambiguous, the doctrine "cannot contradict the statute's plain meaning." Fleming Foods , 6 S.W.3d at 282.
Inexplicably, the Court asserts today that subsection (c) is "susceptible to two or more reasonable interpretations and thus, at a minimum, is ambiguous." Ante at 780. This assertion misrepresents the Court's decisions in Cathey , Simons , Carbajal , and Arancibia , in which the words "ambiguous" and "ambiguity" never appear, not even once. The Court did not purport to construe an "ambiguous" statute in Cathey ; instead, it simply added to the statute's *801 requirements because it believed that construing the statute as written "would eviscerate the purpose of the statute." Cathey , 900 S.W.2d at 341. The fact that a statute may not fully effectuate its judicially presumed purpose does not make the statute ambiguous. Rather, to determine whether a statute is ambiguous we look to the statute's words, not to some unexpressed purpose. Tex. State Bd. of Exam'rs of Marriage & Family Therapists v. Tex. Med. Ass'n , 511 S.W.3d 28, 41 (Tex. 2017) ("A statute is ambiguous if its words are susceptible to two or more reasonable interpretations, and we 'cannot discern legislative intent in the language of the statute itself.' ") (emphasis added) (quoting Tex. Lottery Comm'n v. First State Bank of DeQueen , 325 S.W.3d 628, 639 (Tex. 2010) ); see also DeQueen , 325 S.W.3d at 639 ("[O]nly if we cannot discern legislative intent in the language of the statute itself do we resort to canons of construction or other aids such as which statute is more specific.") (emphasis added). The Court makes no effort to explain why the words of subsection (c) are ambiguous, and I simply cannot agree that they are.
Finally, in my view, the legislative-acceptance fiction itself-as a principle of statutory construction-is of dubious reliability at best. The idea that courts can somehow glean one Legislature's intent in enacting a statute from a subsequent Legislature's failure to amend the statute is, at least as a general principle, illogical in light of our governmental structure. To the extent our goal in construing subsection (c) is to determine "the Legislature's intent," the only "Legislature" that matters is the 69th Texas Legislature, which enacted section 101.101 in 1985. See Acts 1985, 69th Leg., ch. 959, Sec. 1, eff. Sept. 1, 1985. The 70th, 71st, 72nd, and every subsequent Legislature constituted a different body made up of different members with different individual and collective intents. Although the 69th Legislature could not bind the subsequent Legislatures, a statute it enacted remains binding unless and until a later Legislature amends it. Brown v. Shiner , 19 S.W. 686, 688 (1892) ("[O]ne legislature may not bind a succeeding legislature by such provisions, but, until the latter changes the policy so adopted, it would remain in force.").
The legislative-acceptance fiction would assume that some subsequent Legislature intended to amend subsection (c)-or at least intended to ratify this Court's amendment of it in Cathey -based solely on the fact that no subsequent Legislature has amended it. But as we have recently confirmed, this Court attaches "no controlling significance to the Legislature's failure to enact legislation." Entergy , 282 S.W.3d at 442-43. "The intent of the Legislature is derived from the language it finally enacted," Tex. Mut. Ins. Co. v. Ruttiger , 381 S.W.3d 430, 453 (Tex. 2012), not from language a subsequent Legislature failed to enact at all. See United States v. Price , 361 U.S. 304, 310-11 (1960) ("[N]on-action by Congress affords the most dubious foundation for drawing positive inferences .... Whether Congress thought the proposal unwise ... or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress to act."); see also Perez v. United States , 167 F.3d 913, 917 (5th Cir. 1999) ("[D]eductions from congressional inaction are notoriously unreliable."). The Legislature's failure to amend a statute in response to a court decision construing that statute "does not necessarily equate to legislative approval. The Legislature is not required to repair our error, nor are we forbidden to do so ourselves." State v. Medrano , 67 S.W.3d 892, 903 (Tex. Crim. App. 2002).
6. Parties' arguments *802 Finally, I must also consider the fact that neither of the parties has urged us to reconsider Cathey in this case. Of course, Tenorio is the only party who would want us to reconsider Cathey , because the City unquestionably had the actual notice subsection (c) requires. Accordingly, the City must rely on Cathey to argue that it did not have the actual notice Cathey and its progeny require. But I would not expect Tenorio to argue that we should overrule Cathey , at least not without our request for her views on that issue, since she prevailed under Cathey in both the trial court and the court of appeals.[24]
In any event, we have not hesitated to overrule our precedent, even when the parties never argue in favor of that result, when the precedent is simply "inconsistent with the explicit language of" the governing statute. Crawford , 726 S.W.2d at 11. And even if we believed we needed the parties' arguments to make that decision, the Court reverses and dismisses this case without conducting oral argument at which we could invite the parties to address that issue. I would at least schedule argument and invite additional briefing on whether we should reconsider Cathey .
Conclusion
For the reasons explained, I conclude that the Cathey Court erred when it rewrote subsection 101.101(c), and I am not convinced that stare decisis grants us "liberty to perpetuate [that] error." Mitchell , 276 S.W.3d at 447. Although I acknowledge the value of stare decisis, this may be one of those rare cases where stare decisis should not "induce us, despite the plain error of the case, to leave bad enough alone." Johnson , 481 U.S. at 703. At a minimum, I would schedule this case for oral arguments and invite the parties to address whether we should overrule Cathey and its progeny. Because the Court summarily reverses the court of appeals' judgment and dismisses Tenorio's claims, I respectfully dissent.

See, e.g. , Tex. Student Hous. Auth. v. Brazos Cty. Appraisal Dist. , 460 S.W.3d 137, 141 (Tex. 2015).

See Bryan A. Garner, Carlos Bea, Rebecca White Berch, Neil M. Gorsuch, Harris L. Hartz, Nathan L. Hecht, Brett M. Kavanaugh, Alex Kozinski, Sandra L. Lynch, William H. Pryor Jr., Thomas M. Reavley, Jeffrey S. Sutton & Diane P. Wood, the Law of Judicial Precedent 89 (2016) ("Courts must therefore deduce legal rules not only from the language of opinions but from their underlying logic as well.").

900 S.W.2d 339 (Tex. 1995).

Id. at 341.

Id.case-ids="10008337" index="173" url="https://cite.case.law/sw2d/900/339/#p341"> at 340-41 (access to medical records did not convey to the hospital its possible culpability as required to satisfy the purpose of the statutory notice requirement).

Tex. Civ. Prac. & Rem. Code § 101.021, .025.

Id. § 101.101(a).

Id. § 101.101(c).

900 S.W.2d at 341.

140 S.W.3d 338, 345-48 (Tex. 2004).

Id. at 347 (emphasis added).

Id. (quoting Cathey , 900 S.W.2d at 341 ).

Id. at 348.

Tex. Civ. Prac. & Rem. Code § 101.101(a).

See Simons , 140 S.W.3d at 348.

See ante at 778 (requiring proof the City of San Antonio "subjectively believed its officers acted in error").

Simons , 140 S.W.3d at 347.

Id.case-ids="9212456" index="182" url="https://cite.case.law/sw3d/140/338/#p347"> at 348.

Univ. of Tex. at Austin v. Hayes , 327 S.W.3d 113, 116 (Tex. 2010).

Tex. Dep't of Parks & Wildlife v. Miranda , 133 S.W.3d 217, 228 (Tex. 2004).

Id.

City of Keller v. Wilson , 168 S.W.3d 802, 827 (Tex. 2005).

Simons , 140 S.W.3d at 348 ("There will, of course, be times when subjective awareness must be proved, if at all, by circumstantial evidence.").

Bentley v. Bunton , 94 S.W.3d 561, 596 (Tex. 2002) (noting state of mind "must usually ... be proved by circumstantial evidence"); Transp. Ins. Co. v. Moriel , 879 S.W.2d 10, 23 (Tex. 1994) (noting "the practical difficulty of producing direct evidence" of a party's mental state).

See City of Houston v. Torres , 621 S.W.2d 588, 591 (Tex. 1981) ("The purpose of the 'notice of claim' requirement, as recognized by this Court, is to ensure a prompt reporting of claims to enable the municipality to investigate while facts are fresh and conditions remain substantially the same.").

The form provides multiple boxes and codes that allow an investigator to identify more than one contributing factor to a crash. One available code that was not used here is "Wrong Way."

Cathey v. Booth , 900 S.W.2d 339, 341 (Tex. 1995).

324 S.W.3d 537 (Tex. 2010).

Id. at 538.

Id. at 539.

Id.case-ids="7322524" index="195" url="https://cite.case.law/sw3d/324/537/#p537"> at 537.

Id. at 539.

Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia , 324 S.W.3d 544, 550 (Tex. 2010) (quoting Carbajal , 324 S.W.3d at 539 ).

Tex. Dep't of Criminal Justice v. Simons , 140 S.W.3d 338, 347 (Tex. 2003).

Ante at 789-90.

No. 13-10-00689-CV, 2012 WL 1656326, at *1 (Tex. App.-Corpus Christi May 10, 2012, pet. denied) (mem. op.).

Id. at *2 (emphasis added).

City of El Paso v. Viel , 523 S.W.3d 876, 888-89 (Tex. App.-El Paso 2017, no pet.).

DFW Int'l Airport Bd. v. Boykin , No. 02-13-00260-CV, 2014 WL 345642, at *5-6 (Tex. App.-Fort Worth Jan. 30, 2014, pet. denied) (mem. op.).

Sullivan v. Aransas Cty. Navigation Dist. , No. 13-10-00135-CV, 2011 WL 61846, at *6 (Tex. App.-Corpus Christi Jan. 6, 2011, no pet.) (mem. op.).

Cathey v. Booth , 900 S.W.2d 339, 341 (Tex. 1995) ; accord Univ. of Tex. Sw. Med. Ctr. at Dallas v. Estate of Arancibia , 324 S.W.3d 544, 550 (Tex. 2010) ; Tex. Dep't of Criminal Justice v. Simons , 140 S.W.3d 338, 348 (Tex. 2004).

900 S.W.2d at 341.

See post at 788-89 (Boyd, J., dissenting).

Arancibia , 324 S.W.3d at 550.

Id. (quoting Simons , 140 S.W.3d at 347 ).

Id.

See, e.g. , Reed Dickerson, How to Write a Law , 31 NOTRE DAME L. REV. 14, 15 (1955) (asserting that "legal drafting is the most difficult thing a lawyer is called upon to do," and "legislative drafting is the most difficult form of legal drafting" because "legislative problems are technically more complicated and socially more important").

See, e.g. , Tex. Dep't of Criminal Justice v. Miller , 51 S.W.3d 583, 590 (Tex. 2001) ( HECHT , J., concurring) (suggesting that the Legislature included the "use of property" standard in the Texas Tort Claims Act "simply to narrow [the Act's] waiver of immunity enough that Governor Smith would not veto it").

Transcript of Oral Argument at 4, Cyan, Inc. v. Beaver Cty. Employees Ret. Fund , 137 S.Ct. 2325 (2017) (No 15-1439) ("Congress chose a rather obtuse way of saying that federal courts shall have exclusive jurisdiction.") ( GINSBERG , J.).

Robinson v. Cent. Tex. MHMR Ctr. , 780 S.W.2d 169, 170 (Tex. 1989) (quoting Lowe v. Tex. Tech. Univ. , 540 S.W.2d 297, 301 (Greenhill, C.J. concurring)).

Miller , 51 S.W.3d at 591 ( HECHT , J., concurring).

Transcript of Oral Argument at 11, Cyan, 137 S.Ct. 2325 ("You said it's obtuse. That's flattering ... but this is gibberish. It's ... just gibberish.") ( ALITO , J.).

Id. at 41 ("Is there a certain point at which we say this means nothing ... ?") ( ALITO , J.).

The Texas Constitution, unlike its federal counterpart, expressly preserves the separation of government powers:
The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.
TEX. CONST . art. II, § 1 ; see In re Dean , 393 S.W.3d 741, 747 (Tex. 2012) ("The separation of powers doctrine prohibits one branch of government from exercising a power belonging inherently to another.").

See also Entergy Gulf States, Inc. v. Summers , 282 S.W.3d 433, 445 (Tex. 2009) (HECHT, J., concurring) ("To look beyond [a statute's] plain language risks usurping authorship in the name of interpretation. Construing statutes is the judiciary's prerogative; enacting them is the Legislature's. To prevent trespass, this Court and others have repeatedly stressed that statutory construction must be faithful to the plain language of the text."); City of Rockwall v. Hughes , 246 S.W.3d 621, 631 (Tex. 2008) ("[C]hanging the meaning of the statute by adding words to it, we believe, is a legislative function, not a judicial function."); id . at 628 ("[B]y not reading language into the statute when the legislature did not put it there, we do not risk crossing the line between judicial and legislative powers of government as prescribed by article II of the Texas Constitution.").

See Jennings v. Minco Tech. Labs, Inc. , 765 S.W.2d 497, 502 n.4 (Tex. App.-Austin 1989, writ denied) ("There can be no question that courts 'make' law; the only real issue is about the proper exercise of the power.").

See infra part B.3.

In Landingham , the Waco Court of Appeals enforced the ordinance, holding that the claimant did not meet the formal-notice requirements because the "proof offered by the plaintiff" was "not in accordance with the facts as set out in the notice of injury." 158 S.W.2d at 80. In Torres , this Court also enforced the ordinance, rejecting the claimant's argument that he was "excused" from complying with the ordinance's formal-notice requirements because "he believed the injury was trivial." 621 S.W.2d at 589-90. In Artco-Bell , the Court refused to enforce the ordinance, holding that its requirement that the formal notice be verified "represents an unreasonable limitation on the City's liability and is invalid as it is contrary to the limitation of authority placed upon home rule" cities. 616 S.W.2d at 193-94.

Before Cathey , the Austin Court of Appeals concluded that subsection (c) as written is "consistent with the purpose behind the actual-notice requirement-'to enable the [governmental entity] to investigate while facts are fresh and conditions remain substantially the same'-because government-agency personnel who have actual notice of a death, injury, or property damage "are necessarily in a position to inquire as to the details of the time, place, and manner of the injury." Tex. Dep't of Mental Health & Mental Retardation v. Petty , 817 S.W.2d 707, 717 (Tex. App.-Austin 1991) (quoting Torres , 621 S.W.2d at 591 ), aff'd on other grounds , 848 S.W.2d 680 (Tex. 1992), and disapproved of by Cathey , 900 S.W.2d at 341.

Simons , 140 S.W.3d at 345 & n.19 (citing Nat'l Sports & Spirit, Inc. v. Univ. of N. Tex. , 117 S.W.3d 76, 80-81 (Tex. App.-Fort Worth 2003, no pet.) ; Texana Cmty. MHMR Ctr. v. Silvas , 62 S.W.3d 317, 325 (Tex. App.-Corpus Christi 2001, no pet.) ; Garcia v. Tex. Dep't of Crim. Justice , 902 S.W.2d 728, 730-31 (Tex. App.-Houston [14th Dist.] 1995, no writ) ).

Id. at 346 & n.23 (citing Angleton Danbury Hosp. Dist. v. Chavana , 120 S.W.3d 424, 427-28 (Tex. App.-Houston [14th Dist.] 2003, no pet.) ; Nat'l Sports , 117 S.W.3d at 80 ; City of Houston v. Daniels , 66 S.W.3d 420, 424 (Tex. App.-Houston [14th Dist.] 2001, no pet.) ; Brown v. City of Houston , 8 S.W.3d 331, 332-33 (Tex. App.-Waco 1999, pet. denied) ).

Id. at 346 & n.24 (citing Crane Cty. v. Saults , 101 S.W.3d 764, 769 (Tex. App.-El Paso 2003, no pet.) ; City of San Angelo v. Smith , 69 S.W.3d 303, 307 (Tex. App.-Austin 2002, pet. denied) ).

Id. at 346 & n.25 (citing City of San Antonio v. Johnson , 103 S.W.3d 639, 641-42 (Tex. App.-San Antonio 2003, pet denied) (citations omitted); Nat'l Sports , 117 S.W.3d at 80 ; Saults , 101 S.W.3d at 769 ; Smith , 69 S.W.3d at 307 ; Gaskin v. Titus Cty. Hosp. Dist. , 978 S.W.2d 178, 181-83 (Tex. App.-Texarkana 1998, pet. denied) ; Reynosa v. Bexar Cty. Hosp. Dist. , 943 S.W.2d 74, 76-79 (Tex. App.-San Antonio 1997, writ denied) ).

On the same day the Court decided Simons , it decided three other cases that provided additional insight into the Court's construction of subsection (c). In one, the Court held that the governmental unit's "knowledge of the accident and the presence of its employees at the scene did not provide ... actual notice of petitioners' claim within the meaning of section 101.101(c)." Blevins v. Tex. Dep't of Transp. , 140 S.W.3d 337 (Tex. 2004) (per curiam). In another, the Court stated that "actual notice that an injury has occurred is not enough" because subsection (c) requires "evidence that before suit was filed" the governmental unit was "subjectively aware ... that it was at fault" for the injury as the claimant "eventually alleged." Loutzenhiser , 140 S.W.3d 351, 358 (Tex. 2004). In the third, the Court rejected the court of appeals' holding that actual notice "is imputed to a governmental entity if it, or one of its agents, is aware of facts and circumstances surrounding an accident sufficient to put them on inquiry that, if pursued, would reveal its alleged or possible fault producing or contributing to the injury." Johnson , 140 S.W.3d at 351. Instead, the Court explained, "actual notice under section 101.101(c) requires that a governmental unit have knowledge of the information it is entitled to be given under section 101.101(a) and a subjective awareness that its fault produced or contributed to the claimed injury." Id. (quoting Simons , 140 S.W.3d at 348 ).

JUSTICE JOHNSON dissented in Arancibia , finding the Court's decision inconsistent with its holding in Carbajal that "a governmental unit cannot acquire actual notice merely by ... obtaining information that would reasonably suggest its culpability . The governmental unit must have actual, subjective awareness of its fault in the matter." Arancibia , 324 S.W.3d at 559-60 (JOHNSON, J., dissenting) (emphasis added) (quoting Carbajal , 140 S.W.3d at 348 ). The Court rejected JUSTICE JOHNSON'S view-which it characterized as holding that "only an unqualified confession of fault would provide actual notice of the incident"-because " 'fault' as required under Simons is not fault as defined by the defendant, but rather 'as ultimately alleged by the claimant .' " Id. (quoting Simons , 140 S.W.3d at 347 ).

See Tex. Dep't of Transp. v. Anderson , No. 12-07-00268-CV, 2008 WL 186867, at *6 (Tex. App.-Tyler, Jan. 23, 2008) (mem. op.) (Hoyle, J. concurring) (noting that Simons "dramatically changed the required proof to satisfy subsection 101.101(c)" by requiring notice of a governmental entity's "possible fault" as opposed to its "alleged fault"); id. at *10 (Griffith, J. dissenting) (discussing the problems inherent in assigning culpability to a governmental entity with many actors, agents, and representatives); see also Transp. Ins. Co. v. Moriel , 879 S.W.2d 10, 23 (Tex. 1994) (recognizing "the practical difficulty of producing direct evidence" of a party's mental state); cf. Veasey v. Abbott , 830 F.3d 216, 230 (5th Cir. 2016) (" 'Proving the motivation behind official action is often a problematic undertaking.' ") (quoting Hunter v. Underwood , 471 U.S. 222, 228 (1985) ).

See, e.g. , La Joya Indep. Sch. Dist. v. Gonzalez , 532 S.W.3d 892, 901 (Tex. App.-Corpus Christi 2017, pet. filed) (holding evidence that school bus driver was "subjectively aware of his own potential fault" in causing student to be struck by vehicle creates "a fact issue as to whether the District was subjectively aware of its alleged fault"); Univ. of N. Tex. Health Sci. Ctr. v. Jimenez , No. 02-16-00368-CV, 2017 WL 3298396, at *3, *5 (Tex. App.-Fort Worth, Aug. 3, 2017, pet. filed) (mem. op.) (holding surgeon's notation of esophageal perforation in operating report constituted no evidence that governmental unit had "subjective awareness that [it] was at fault in producing or contributing to [the] injuries" because no evidence "demonstrates that a perforated esophagus necessarily-or even most likely-must result from medical error" or establishes that surgeon's knowledge "should be imputed" to governmental unit).

See, e.g. , James v. Vernon Calhoun Packing Co. , 498 S.W.2d 160, 163 (Tex. 1973) ("The Legislature has met in regular session eighteen times since Woolsey was decided in 1938, and the statutory provision in question has not been changed. In these circumstances and since the construction adopted 35 years ago is entirely reasonable, it is our opinion that the meaning of the statute should not be changed now except by legislative enactment."); Marmon , 430 S.W.2d at 186 ("A statute is the creation of the Legislature and should an interpretation of a statute by the courts be unacceptable to the Legislature, a simple remedy is available by the process of legislative amendment.").

Quoting Johnson v. Transp. Agency, Santa Clara Cty. , 480 U.S. 616, 672 (1987) (Scalia, J. dissenting) (referring to the "congressional inaction" rule as a "canard" because a later Congress's inaction should not be used to interpret the statute of an earlier Congress); Wenke v. Gehl Co. , 682 N.W.2d 405, 417 (Wis. 2004) ("[P]roper invocation of the doctrine of legislative acquiescence requires more than merely noting that the legislature has not amended a statute to 'correct' a prior judicial construction. The doctrine of legislative acquiescence is merely a presumption to aid in statutory construction."); Johnson v. State , 91 So.2d 185, 187 (Fla. 1986) (en banc).

Of course, Tenorio may file a motion for rehearing arguing that we should overrule Cathey and apply the language the Legislature enacted in subsection (c). I don't know whether doing that will be worth the effort, but I am at least hopeful that parties in other pending and future cases involving subsection (c) will raise the issue.